Argued March 13, admission denied September 6, petition for
rehearing denied October 1, 1974

IN THE MATTER OF THE APPLICATION OF
SPENCER WARD ALPERT, *Applicant.*
525 P2d 1042

*J. W. Walton,* Corvallis, and *Donald Dole,* Roseburg, argued the cause and filed a brief for the Oregon State Bar.

*Joe B. Richards,* Eugene, argued the cause for ap-

plicant. With him on the brief were Luvaas, Cobb, Richards & Fraser, Eugene.

Before O'Connell, Chief Justice, and McAllister, Holman, Tongue, Howell, and Bryson, Justices.

PER CURIAM.

Applicant requests admission to the Oregon State Bar. He successfully passed the Oregon Bar examination but because of his lack of good moral character, he was not recommended for admission by the Board of Bar Examiners. Thereafter a hearing was held before a trial committee pursuant to the Rules for Admission of Attorneys. The trial committee recommended applicant's admission and the Oregon State Bar requested review by this court.

In order to shorten this opinion, no mention will be made of the numerous grounds for objection to applicant's character which we consider not to be proved or of insufficient importance to be determinative.

Applicant was born January 30, 1945; at the time of the hearing he was 28 years of age. His first serious breach of social conduct was at the age of 16, when he and two other youths broke into a warehouse and stole alcoholic beverages. Had he been an adult, he would have been guilty of burglary.

At ages 18 and 19, while an undergraduate at college, he defrauded innkeepers at numerous times by what was called "tennis shoeing," or walking out without paying for meals or motel accommodations.

At age 21 he stopped his vehicle in the street and, going over to another vehicle, punched the 17-

year-old driver of that vehicle in the face because someone in that vehicle had "flipped us the bird," i.e., made an obscene gesture. Also, applicant claims the other vehicle cut in on him and crowded him. The driver of the other vehicle claims they were racing and applicant was defeated. In any event, there was insufficient provocation for such action.

At the same age he was charged with giving liquor to a minor. This charge probably arose out of his arrest in the matter previously set forth, but the record is not clear. Applicant claims the youth to whom the liquor was given was only a few months under 21 years of age.

During the ten-year period from 1962 to 1972 applicant had 13 moving violations on his driving record, three license suspensions because of his driving record, and was involved in three accidents. The last driver's license suspension was at age 23.

At age 25, when approximately half way through law school, he engaged in a course of dealing in stocks at the urging of a friend who worked for a stockbroker in San Francisco. Orders for stock were placed with the broker in San Francisco on a "payment versus delivery" basis. Pursuant to an order, the broker would buy stock for applicant's account and mail to a bank in Eugene the stock certificates together with a sight draft drawn on applicant for the price of the stock. The bank was instructed to deliver the stock on payment of the draft. It is customary for banks, in the absence of contrary instructions, to retain such a draft for six days for payment before returning the stock and the draft to the broker. Stock certificates are usually not available until several weeks after purchase. As a result of this lapse of time, the six-day waiting period,

and the time required for mail delivery a month could elapse between the time of placing the order and the time payment was required of applicant.

Applicant's plan was to purchase only stock which his friend told him, on the basis of inside information, would go up. Upon notification that the stocks were being mailed or had arrived at the bank, applicant planned to sell the stocks at the increased price through a broker in Oregon and use his sale proceeds to pay the sight draft and to obtain possession of the stock so delivery could be made to the new purchaser. He could thus get a "free ride" without investment of his own funds. At the time he did not have adequate funds of his own to pay substantial losses.

During the period from January 2, 1970, to February 3, 1970, applicant purchased in this manner approximately $240,000 worth of stocks. The market was falling and he soon ran into difficulty. He used his own funds to make up the difference between his purchase price and the amount for which the falling stocks could be sold, but these funds were soon exhausted and he could not take delivery. In the hope the market would go up, he continued to buy in order to get even. Of the $240,000 worth of stock he ordered, approximately $133,000 was returned to the broker in San Francisco and was sold for his account at a reduced price; approximately $86,000 worth was taken over by a business acquaintance, Metzker, who assumed responsibility for payment.

Applicant contends that all the stock purchases subsequent to January 19, 1970, were made pursuant to the authority of Metzker, who had adequate funds to pay losses. However, we find it difficult to reconcile

the evidence with this contention. Metzker initially testified that he became obligated to take only the stocks of his choosing from among those which applicant had ordered prior to February 3, 1970. He then recanted when he was shown his pleading in litigation presently existing between the broker in California and applicant and himself, which pleading indicated he became obligated for all stocks purchased subsequent to January 19. However, applicant's written authority to transfer certain stocks from his account to Metzker's, Metzker's acceptance, and the books of the broker all point to Metzker's initial testimony as being correct in that those exhibits disclosed only certain stocks as having been transferred to Metzker's account without regard to whether they were purchased before or after January 19 by applicant. In addition, a letter by applicant to the San Francisco broker indicates he was accepting sole responsibility for many stocks purchased after January 19 which were not transferred to Metzker. Applicant will have to bear the full responsibility for purchasing the entire $240,000 worth of stock without having adequate or any substantial means with which to pay losses if the price went down.

After securing the credit of Metzker, applicant and Metzker continued the described method of trading until they were told it was illegal; however, the figures relating to these stocks were not considered in arriving at the computations contained in this opinion.

In the action by the San Francisco broker against applicant and Metzker to recover the broker's losses on the transactions, applicant asserts that the transactions were illegal insofar as the broker is concerned and that the stock purchases are therefore voidable by applicant. He asserts that rather than being re-

sponsible for the broker's losses, he is entitled to recover his losses from the broker.

Applicant brought to the hearing an impressive parade of character witnesses. Most of these were business acquaintances who testified his word was as good as his bond and that he was completely honest and trustworthy. There was one witness who thought applicant had some difficulty with basic values. Persons connected with the University of Oregon testified that his services were extremely valuable as a student leader and as a member of the student senate in keeping violence at a minimum and in cooperating with the authorities during the Viet Nam disturbances at the University. At the time of trial applicant was working as a layman in the Lane County District Attorney's office where he was highly esteemed.

Applicant has been engaged in the used car business since his teens and has operated such a business on his own but without too much financial success, however. He had extensive credit at financial institutions and should have been cognizant of financial matters far beyond that which is usual for one of his age.

The evidence is that applicant made inquiries of his banker and his Oregon stockbrokers concerning the propriety of the manner in which he was dealing with the stocks. His banker and his principal Oregon broker, who told him it was all right, would not admit that they knew he was reselling the stock before he took delivery (which seems to be the principal act which makes the transaction illegal, if such is the case). However, in fairness to applicant, it must be said that his banker and his principal broker, with whose aid he took delivery and sold the stocks, must have known that such was the case, since the broker would pay the

sight draft at the bank with the money from the re-sale and pick up the stocks. The truth probably is that no one realized such a procedure is contrary to federal laws and regulations, if this is the case, and the broker who was reselling the stock and the banker were not otherwise concerned with the ethics of the situation.

The trial committee found that because the serious violations of the law occurred when applicant was young, they were not indicative of his present character. They also found that the acts surrounding the stock transaction. charges were merely technical violations of the law; that applicant had been initially informed by reputable persons that his method of trading on the market was legal but that, when he was advised to the contrary, he immediately ceased operations; and that at no time did he engage in conduct which fairly could be classified as fraudulent. The trial committee also expressed itself as being impressed with applicant's frankness and forthrightness, and it undoubtedly concluded that he had now matured and was a good risk.

Much time has been wasted in a discussion of whether the stock arrangement was legal. Legality is beside the point. The issue is applicant's sense of ethics. He says he did not realize there was the possibility that the stocks would go down because of the expert advice he was getting from his friend who worked for the broker in San Francisco. It is difficult to envisage one with applicant's business experiences being so naive. He must have known that the stocks could go down (though he did not think they would) and that, if they did, the losses, although billed to him, would ultimately have to be borne by someone other than himself, i.e., the broker, since applicant knew that

he himself could not pay. There is a difference between the ethics of playing when you can pay if you lose, and those of playing when you know you cannot pay and someone else will actually bear any loss. He was gambling in the market with someone else's money.

Applicant would like us to believe that the broker in San Francisco was willing to take a chance even though he knew applicant was not able to pay and everything was therefore aboveboard. It is true that his friend with whom he arranged the method of dealing did know applicant was without resources, but there is no indication that he ever told his employer. Such evidence as there is, to the contrary, indicates the friend informed his employer that applicant was a businessman of consequence. Applicant's so-called friend may have been playing both ends against the middle, thus making brokerage fees for himself. There is no evidence that applicant knew of any conversation between his friend and his friend's employer, but basic values should have informed him that his friend's employer might not be enamored with the arrangement.

The following is an examination of applicant concerning the matter by the chairman of the trial committee:

"Q Well, I assume that you obviously knew that the stock did go down, that you were going to have to cover from some place?

"A I know it now.

"Q No, I mean when you went into the deal, though?

"A When I went into the deal, based on what Mr. Scripter [his friend] had told me and from what I had seen that he had done with my account and the way he traded in the back room and with his reputations that he always had his fingers on

the market, and would be able to provide us with stocks that were going to be going down and not up [sic], and it didn't occur to me that the stocks were going down so we would have a loss.

"Q Now, you had been in the market for some time before that?

"A The only market transactions that I had had before I got involved with my arrangements with Mr. Scripter was 50 shares of the stock, and I bought it from Bruce Ward earlier that year. My transactions with Mr. Scripter were all just based on my trust in him.

"Q But you hadn't bought any stock except for that 50 shares from any broker before that?

"A That is correct.

"Q Your business dealings before that time had all been cars and—

"A Yes.

"Q —that sort of thing?

"A That's correct.

"Q But now you're telling us that it never entered in your mind that the stock would ever go down at the time that you invested?

"A I don't want to say that it never entered my mind. I just simply didn't believe that they would, or at least I chose not to, on account of what Mr. Scripter had told me.

"Q Well, then you had—you had no provision in your thinking for covering in event they did go down, is that right?

"A Essentially that's correct.

"Q Do you recall about when the first time it occurred that a stock did go down and you were short?

"A When?

"Q Or how long that was in point of time?

"A Oh, it was very soon after.

"Q   Starting the system?

"A   After, we started the system, and that is why, when, the first drafts came in, because the stocks have gone down by then, I made other arrangements to—that is, to use what capital I had to—or to use money that was available to me through loans in order to pay for the stock or to pay for the deficiency in the case of selling it.

"Q   And you did?

"A   And I did that.

"Q   Only, except you didn't pay this some $20,000 that occurred?

"A   That's correct.

"Q   Now after that first occasion, I am sure you knew that they can go down, is that right?

"A   Yes.

"Q   Then what did you do to make provisions to cover in case of deficiency?

"A   After this first situation, whereas, you see, I could see the stocks could go down.

"Q   In other words, that Mr. Scripter could be wrong?

"A   Yes. I was naturally quite alarmed and conveyed this alarm to Scripter. We were on the phone quite often, and I continually expressed my alarm to him about that, and he continually assured me that there was no problem. Despite that, I became very nervous and worried and—

"Q   But you continued to trade in this system?

"A   I can't pinpoint in time when I became nervous and, you know, when the trades were made, but suffice to say that this was all happening within an extremely short period of time, and it was right about that time when, as I continued to express my concern to Mr. Scripter, and asked him if he had any specific suggestions, because I knew these drafts were going to be coming in, and I wouldn't

even have the money to pay the deficiency, that he suggested that I talk to Mr. Metzker."

The record discloses that subsequent to applicant's disastrous experience with the stock market he traded in the commodities market. There is an indication he was trading in contracts for commodities involving more than $800,000. However, there is no charge that there was anything illegal or unethical concerning such trading. It is relevant, however, as an insight into the kind of chances applicant is willing to take.

■ One of the most difficult kinds of decisions this court has to make is that which involves a contested case of admission to practice. Applicant successfully completed three years of law school and passed the bar examination. He obviously is an extremely intelligent, energetic and ingenious young man. However, this court's primary responsibility is to the public to see that those who are admitted to practice are ethically cognizant and mature individuals who have the character to withstand the temptations which are placed before them as they handle other people's money and affairs. Under our decisions and statutes an applicant has the burden of convincing this court that he is a person of good moral character. ORS 9.220; *In re Bernard Jolles,* 235 Or 262, 271, 383 P2d 388 (1963). If we are not reasonably convinced that the applicant can withstand such temptations we should not admit him. Doubt of consequence, of necessity, must be decided in favor of the public's protection. There lie our first duty and concern. Presently we have such a doubt.

■ However, we do not mean to say that he will never be eligible for admittance. Hopefully time may

prove that the trial board is right and that petitioner has morally and emotionally matured sufficiently to undertake the duties and to withstand the strains and temptations of the practice of law. We are not as sure as the trial board that such is presently the case because we take a more serious view of the morality of the applicant's stock transactions than did the board and those transactions occurred comparatively recently while the applicant was in law school. We believe the passage of more time is necessary to assure that the requisite maturity has taken place.

We presently deny the applicant's request for admission to practice law with leave to reapply after January 1, 1977. Upon such reapplication a reinvestigation of applicant's moral character by the Board of Bar Examiners will be ordered by this court and his reapplication will be given consideration. If such reapplication is made within a reasonable time after January 1, 1977, there will be no necessity for applicant to be re-examined concerning his professional skills.