IN THE MATTER OF THE APPLICATION OF
ALLAN S. FOR ADMISSION TO THE
BAR OF MARYLAND

[September Term, 1977.]

*Decided June 6, 1978.*

684

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Stephen H. Sachs* for applicant.

MURPHY, C. J., delivered the opinion of the Court. SMITH, DIGGES and ORTH, JJ., dissent and DIGGES, J., filed a dissenting opinion in which SMITH and ORTH, JJ., concur at page 693 *infra*.

Whether the applicant in this case possesses the requisite moral character that would justify his admission to the Bar of Maryland is the issue before us for determination.

Rule 2 c 2 of the Rules Governing Admission to the Bar of Maryland requires every applicant who registers to take the bar examination to complete and file with the State Board of Law Examiners a Character Questionnaire "designed to elicit from [him] information concerning such of his personal history and previous conduct as may throw light upon his moral character fitness for Bar membership." The Board is required to refer the questionnaire to a Character Committee, created by Rule 4 a, in the judicial circuit in which the applicant resides. The Committee is enjoined by Rule 4 b:

> "promptly, through one or more of its members [to] (i) personally interview the applicant; (ii) verify the facts stated in the Character Questionnaire, including the fact of his Maryland domicile, contact the references therein given and make such further investigation as it may deem desirable or necessary; (iii) consider the character and fitness of the

applicant to be admitted to the Bar; and (iv) transmit to the Board a report of its investigation and its recommendation as to the applicant's character, fitness and standing to be admitted to the Bar."

Upon receipt of the Character Committee's report, the Board may find "because of matters reported to it by the Committee or for any other reason ... that there apparently exist proper grounds for disapproval of [the] application." Rule 4 c. If the Board recommends that an adverse report should be made, and the applicant refuses to withdraw his application, Rule 4 c directs that this Court "shall require the applicant to show cause why his application should not be denied." The rule provides that proceedings before us "shall be heard ... upon the records made by the Character Committee and the Board." Rule 2 provides that the applicant "shall at all times have the burden of proving his good moral character before the Character Committee, the Board and the Court ...." [1]

Consistent with this procedure, the applicant in the present case submitted a completed Character Questionnaire to the Board on January 23, 1976, and it was promptly referred for investigation to the Character Committee. In his questionnaire the applicant revealed that he had been arrested on two occasions, once in 1966 for stealing a bottle of rum from a supermarket and again in 1971 for stealing a tape measure.

The Character Committee, all five members being present, held an evidentiary hearing to determine the applicant's moral character fitness for admission to the Bar. After several witnesses had testified as to the applicant's good moral character, the applicant testified on his own behalf. He said he entered college at the age of 16. In June of 1966, during his junior year when he was 19 years old, the applicant met two young women while traveling on a vacation trip in California with his college roommate. On a "dare," and to

---

1. Maryland Code (1957, 1976 Repl. Vol.) Art. 10, § 3 (c) provides, as a prerequisite to admission to the Bar of Maryland, that we find that the applicant is "of good moral character, worthy to be admitted ...."

impress the young women, the applicant took a bottle of rum from a supermarket and concealed it under his shirt. He was caught and charged with petty theft. He obtained counsel and the case was later dismissed. The applicant readily admitted his guilt of the offense.

The applicant entered law school at the age of 20. At that time he had strong feelings against the Vietnam War and did not want to enter the army. He said he was disillusioned that the truth was not being told to the American people. After his first year of law school, he left the country and entered a medical school in Spain; this entitled him to an automatic deferment from the draft. In less than a year, however, he returned to this country, resigned to the fact that he would be drafted into the army. He received a high lottery number in the draft and thereafter reentered law school. His disillusionment with the Vietnam War and his cynicism about American society and justice continued unabated. He said he lacked respect for American institutions, was opposed to capitalism, the Dow Chemical Company, bombs, and the like. In May of 1971, during his senior year in law school, the applicant participated in the so-called May Day demonstrations in Washington, D.C. Along with many other demonstrators, he was picked up by the police, briefly confined, but not placed in an arrest status.

He graduated from law school in June of 1971 at the age of 24. He said that the times were then confusing, the schools were in a state of upheaval and he thought he could never become a lawyer. He wanted to get away from the "establishment" and what he then considered false American ideals. He did not take the bar examination. Together with three other law school graduates, the applicant obtained access to a 30-acre farm in Montgomery County and they began a group or communal farm. It was their thought that they could make a contribution to society by starting a counter-culture characterized by growing organic vegetables, using neither pesticides nor fertilizers, and giving them to inner-city poor blacks and other needy persons.

The members of the communal farm began to build their own house. In October of 1971 the applicant went to a

department store in Montgomery County where he took a measuring tape worth $4.99 and put it in his pocket. Although he had money to pay for it, his continuing cynicism and distaste for big institutional structures was such that he believed that stealing the tape was an act symbolic of his disrespect for the system. He was again caught and arrested for shoplifting. He employed counsel and the case was subsequently stetted and later dismissed. Applicant remained on the communal farm for almost three years. During this period, he learned carpentry skills and worked as a carpenter during the winter months. In June of 1974, the applicant left the farm and thereafter found work with various employers as a busboy, waiter, restaurant worker, carpenter, substitute teacher in a public school system and law clerk.

The applicant testified that he learned from his experience working on the farm that it was not possible to make everything work the way he thought it should. Shortly after his 1971 arrest, he began to undergo a transformation, a process of change which enabled him to have "a better understanding of justice"; he came to see how the law worked and that it was "really made for the people and to protect the people." He decided in the late fall of 1975 to take the bar examination; he thought that if he became a lawyer, he could better uphold the laws of society while at the same time working for change.

The applicant passed the 1976 mid-winter bar examination. At the time of the hearing before the Character Committee in September of 1976, he was 29 years old. He was no longer rebellious, although he asserted a belief that a number of things in society should be corrected. He characterized his criminal transgressions as immature, idiotic and a mistake. He was contrite and remorseful; he freely admitted his guilt of the offenses, even though the charges were dismissed.

The Character Committee concluded from the evidence that the applicant was presently of good moral character and recommended his admission. It said:

> "As a result of the hearing and a review of the records in the case, the Committee was of the

opinion, due to the minor nature of the offenses and also due to the fact that the last incident occurred approximately five years ago and that the applicant since that time appears to have conducted himself properly, that the applicant should be recommended for admission to the Bar. The members of the Committee were polled and the decision of the Committee was unanimous."

The State Board of Law Examiners after considering the report of the Character Committee decided that grounds existed for disapproval of the application. It therefore held an evidentiary hearing on February 23, 1977, at which virtually the same evidence adduced before the Character Committee was reintroduced before the Board; additionally, the transcript of the Character Committee hearing was incorporated and made a part of the Board's proceedings. The Board recommended that the applicant not be admitted. After a detailed review of the evidence, it concluded:

"The Board is not convinced that the applicant possesses the character required of one who would practice law as a member of the Bar. We are not convinced that the two incidents in applicant's life have contributed to that growth and maturity which would prevent further acts indicative of a lack of the requisite character. We are of the opinion that applicant learned little from the California arrest, which of itself should have prevented the Montgomery County arrest. Further, the Board is not persuaded of the sincerity of applicant in describing the act in Montgomery County as being a symbolic act, since his subsequent conduct was inconsistent with such a motivation. In this regard, the Board is of the opinion that in his testimony before the Board and before the Character Committee, applicant was less than candid. Finally, the Board is not convinced that applicant has demonstrated that he has been sufficiently rehabilitated to meet the standard for admission. He

attempts to explain away the California incident as a youthful prank and an attempt to impress new-found friends; he describes the Montgomery County incident as a symbolic act, the product of disaffection and rebellion during a difficult period of our nation's history. At no point during his testimony did he admit clearly and convincingly that the acts were morally wrong and indefensible.

"The Board has considered the many letters of recommendation submitted by outstanding citizens; the testimony of his character witnesses ...; the unanimous opinion of the Character Committee of the Sixth Circuit; the testimony of the applicant on his own behalf, and the excellent argument of counsel. On the basis of the record before us, we conclude that the applicant has not met the burden of proving his good moral character as required by Rule 2d."

Upon this Court falls the primary and ultimate responsibility for regulating the practice of law and the conduct and admission of attorneys in this State. *Pub. Serv. Comm'n v. Hahn Transp., Inc.,* 253 Md. 571, 253 A. 2d 845 (1969). No duty in this respect ranks higher than our obligation to the public and to the legal profession to assure that applicants seeking original admission to the Bar possess the requisite moral character fitness to conduct the affairs of others both in and out of court. No attribute in a lawyer is more important than good moral character; indeed, it is absolutely essential to the preservation of our legal system and the integrity of the courts. *See Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 318 A. 2d 811 (1974); *Application of Alpert,* 269 Or. 508, 525 P. 2d 1042 (1974); *In re Monaghan,* 126 Vt. 53, 222 A. 2d 665 (1966).

While there is no litmus test by which to determine whether an applicant for admission to the Bar possesses good moral character, we have said that no moral character qualification for Bar membership is more important than truthfulness and candor. *Fellner v. Bar Ass'n,* 213 Md. 243, 131 A. 2d 729

(1957); *In re Meyerson,* 190 Md. 671, 59 A. 2d 489 (1948). Where, as here, an applicant for admission to the Bar is shown to have committed a crime, the nature of the offense must be taken into consideration in determining whether his present moral character is good. *Schware v. Board of Bar Examiners,* 353 U. S. 232, 77 S. Ct. 752, 1 L.Ed.2d 796 (1957); *In re Monaghan, supra.* Although a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. *See Application of Davis,* 38 Ohio St. 2d 273, 313 N.E.2d 363 (1974); *Application of Alpert, supra.* Thus, a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character. *See In re Dreier,* 258 F. 2d 68 (3rd Cir. 1958), and *In re Florida Board of Bar Examiners,* 183 So. 2d 688 (Fla. 1966). It is not without significance in this regard, as bearing upon moral fitness, that an applicant for admission to the bar refuses to admit his criminal conduct. *Fellner v. Bar Ass'n, supra.*

The ultimate test of present moral character, applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion. *See March v. Committee of Bar Examiners,* 67 Cal. 2d 718, 433 P. 2d 191, 63 Cal. Rptr. 399 (1967). *Cf. In re Braverman,* 271 Md. 196, 316 A. 2d 246 (1974), and *In re Meyerson, supra.* That the absence of good moral character in the past is secondary to the existence of good moral character in the present is a cardinal principle in considering applications for original admission to the Bar. *Application of Davis, supra; In re Monaghan, supra. See also* Annot., 64 A.L.R.2d 301 (1959).

The Board's recommendation that an applicant does not possess the requisite moral character fitness is, of course,

entitled to great weight. In considering it, however, we do not apply the "substantial evidence" test applicable to court review of decisions of administrative agencies; rather, we make our own independent evaluation of the applicant's present moral character based "upon the records made by the Character Committee and the Board." Rule 4 c of the Rules Governing Admission to the Bar of Maryland. That provision was not contained in our rules when we said in *Character Committee v. Mandras,* 233 Md. 285, 196 A. 2d 630 (1964), that "the Board's findings of fact are presumptively correct or at least entitled to weight where based upon the testimony of witnesses whose credibility may be in issue." 233 Md. at 288.

At the heart of the Board's recommendation that the applicant not be admitted to Bar membership is its determination that the explanation of his 1971 theft offense as being a symbolic act was neither sincere nor candid. It is evident from the Board's opinion, considered in light of the colloquy between the applicant and the Board members at the hearing, that it simply did not believe that the act of theft was a symbolic one, for had it been the applicant would not have so readily sacrificed his principles by engaging counsel to extricate him from his trouble.

We think the Board has afforded controlling weight to that part of the applicant's testimony that involves the 1971 theft and has given insufficient consideration to his present moral character and the evidence of his rehabilitation since the commission of that offense. It must be remembered that applicant's first offense occurred in 1966, eleven years prior to the hearing before the Board; the 1971 offense occurred almost seven years prior to that hearing. While there can be no doubt that each of these offenses, though petty in nature, involved moral turpitude, the applicant readily admitted that he committed the crimes even though he was never tried or convicted of either of them. In this respect, he was most candid with the Board and we cannot agree, in view of the record in this case, that the applicant did not admit that his acts were morally wrong and indefensible. On the contrary, he did so repeatedly, both before the Character Committee and the Board, and we are satisfied that he is deeply distressed that he participated in such conduct.

In undertaking to prove his good moral character, the applicant was largely limited to the production of opinion evidence by those who know him. And letters attesting to his good character are entitled to respectful consideration. *See Application of Guberman,* 90 Ariz. 27, 363 P. 2d 617 (1961); *Petition of Waters,* 84 Nev. 712, 447 P. 2d 661 (1968); *March v. Committee of Bar Examiners, supra.* The record before us contains letters from a number of members of the legal and lay community, all to the effect that the applicant presently possesses the good moral character required of a member of the Maryland Bar. One letter, from a former Securities Commissioner of Maryland, for whom the applicant has worked as a law clerk, contains a particularly strong endorsement of his present good moral character and he testified to the same effect at the hearing. Other similarly impressive expressions of unqualified trust in applicant's moral character are also in evidence.

There was no evidence in the record even remotely suggesting that the applicant has been involved in any misconduct in the years following the 1971 theft offense. The inference to be drawn is that during this interim period there has been a decided improvement in the applicant's conduct and behavior. *See In re Monaghan, supra.*

That the Board could not — and indeed we cannot — understand the applicant's prior misconduct in its social and historic context, as he asks that we do, does not mean that he did not genuinely entertain the beliefs which he then espoused. To conclude on such a flimsy foundation that the applicant lied to the Board as to his reason for committing the 1971 offense is likely to forever bar him from admission since, as we have said, no moral character qualification is more important than truthfulness and candor. *Fellner v. Bar Ass'n, supra.*

Giving due consideration to the nature of the applicant's offenses, the time of their commission, the other circumstances involved, the fact that the burden rests at all times upon the applicant to prove his good moral character, and, most importantly, the convincing evidence of the applicant's rehabilitation, we think he has established his

present moral character fitness to be admitted to the Bar of this State.[2]

*It is so ordered.*

*Digges, J., dissenting:*

Since the time of Moses, if not before, "Thou shalt not steal" has been understood as one of our basic legal and moral tenets. The majority nevertheless apparently believes that there is no great harm in having "a thief or two"[1] admitted to the Maryland Bar. Ignoring the findings and recommendation of its own Board of Law Examiners, the Court today approves the admission of a man who, at the age of 24 and after the completion of his legal education, stole a carpenter's measuring tape from a local department store. With its action, I believe, the Court takes a giant leap backward, abdicating its high responsibility to assure the public that nothing in the background of an applicant for bar membership has been discovered to reasonably indicate that the prospective attorney might not be possessed of "the basic qualities of honor traditionally associated with members of the bar of this State." *Bar Ass'n v. Marshall,* 269 Md. 510, 520, 307 A. 2d 677, 682 (1973). I respectfully decline to add my approval to the Court's action for two reasons, either of which in my view compels a refusal to admit this applicant to the practice of law in Maryland: (1) I believe that theft, however petty, committed after three years of exposure to and study of the legal system — out of which should have emerged some appreciation for the fact that lawyers cannot be thieves —

---

2. We reached a different conclusion in the application of Michael M. for admission to the Bar of Maryland. The applicant there had been convicted of two theft offenses while in college; each was a misdemeanor, the first committed at age 18 and the second, for which he was sentenced to 20 days in jail, at age 24. The latter offense involved the theft of a clock radio valued at $51. When the applicant originally applied for admission to law school, he answered "No" to the question: "Have you ever been convicted of or charged with any crime other than a minor traffic violation?" While the Board recommended the applicant's admission, a divided Court rejected that recommendation without prejudice to reapply at a later time. Although evidence of the applicant's rehabilitation was submitted on reapplication, the application was again denied, three judges dissenting.

1. W. Shakespeare, *Measure for Measure,* act II, scene i, line 19 (1604-05).

indicates a lack of the fitness we are entitled to demand of those whose duties require "moral standards that are more stringent than those applicable to others," *id.* at 518 [682]; and (2) the Court's decision, rejecting as it does a factual finding of the Board of Law Examiners as to the applicant's credibility, and substituting its own assessment without the benefit of the personal appearance before it of any witness, completely vitiates the Board's fact-finding role in determining the moral fitness of an applicant for membership in the Bar.

The first of the propositions upon which I base my dissent from the action the Court takes today is fundamental if our assurances to the public of the trustworthiness of persons practicing law in this State are to be given any credence at all. I frankly think that petty thievery, particularly when of a repetitive nature, is usually indicative of a character flaw so serious that I am unwilling to represent to the public that a person who has engaged in it is deserving of a client's unreserved reliance. I cannot say that a person who has committed larceny is more likely to steal a client's funds than one who has not; I can and do say that I am not willing to take the responsibility for asserting to the public that a petty thief is as worthy of trust as anyone else, so that a client should freely entrust him with his monies and affairs.

As a general proposition, I do not suggest that it is impossible for a person to prove his full and complete rehabilitation such as would justify this Court's placing its imprimatur on his admission to the Bar, even though he has committed acts of petty thievery in the past. It would indeed be harsh to allow a mere teenage indiscretion — normally regretted and never to be repeated in adult life — to preclude a person from pursuing any particular career. If such an indiscretion were the only misconduct impeding an applicant's admission to the Bar, I would likely agree that he should be accepted. However, this applicant's first shoplifting experience in California was a good deal more culpable than would appear from its cursory portrayal by the majority as a juvenile prank done "on a dare" to impress his female friends. I feel constrained to point out that, by the applicant's

own admission, the four young people traveling together, though they had enough money to pay for what they wanted, chose not to use it, and instead conspired and agreed in advance that they would enter a supermarket for the specific purpose of stealing the makings for their evening meal, with each person being assigned to take a particular item or items. This, I think, is substantially different from the incident's characterization as a spur-of-the-moment act to impress the young women in the group, and I have grave reservations about the character of a person who, at nineteen and after three years of university education, would engage in such an unlawful scheme.

I emphasize, however, that it is the second shoplifting incident which I find the more egregious of this applicant's two thefts; whatever had been the circumstances surrounding the first, the commission of the second, following as it did completion of a legal education, would in my view be disqualifying. More than five years after the California occurrence — after having the experience of being arrested and charged with theft and of obtaining counsel to represent him; after three years of exposure to the law, to lawyers and to their role in and responsibility to the legal system; and well beyond his teenage years — this applicant committed yet another act of thievery. I would hold that under those circumstances the applicant simply cannot at this time show that he has been rehabilitated to the extent that this Court can endorse his integrity without reservation. If the trauma of being arrested, the lapse of five years, and a legal education could not insure that the applicant would not steal again, I fail to see how the lapse of another five years from a second theft — now six and one half years — plus a number of letters expressing a favorable opinion of the applicant's present moral character, can possibly do so.[2]

Factually this case is quite similar to another before us only two years ago in which we refused to admit the candidate to

---

**2.** And for what reason do we carefully refrain from naming the applicant? If the Court is willing to assure the public that his honesty and integrity are not open to doubt, what possible harm can come from associating his name with the shoplifting incidents he has admitted?

the Bar. That applicant had been convicted of petty theft at the age of 18, and of shoplifting at the age of 24; a little more than a year after the shoplifting offense he applied for admission to law school, failing to disclose his two convictions on his application. Both the character committee and the Board had unanimously recommended his acceptance — the Board being "impressed ... by his demeanor and candid admissions, as well as his remorse" — and strong letters of endorsement were received from the law school dean and high officials in the United States Attorney's office, where the applicant had worked as a law clerk for more than a year. Though no opinion was filed, it seems clear that this Court decided, as a matter of law, that not enough time had elapsed since the last transgression to enable us to conclude that the applicant had been rehabilitated. If our determination there was justifiable — and I have no doubt that it was — I think it compels a similar result here. In the former case, four years elapsed between the last transgression — failure to reveal the convictions on his law school application — and the Board's favorable recommendation. Here, six years elapsed between the last transgression and the Board's unfavorable recommendation. Except for the additional two-year lapse, there is literally nothing to suggest that the present applicant is more worthy of admission than was the other — and there is the Board's unfavorable recommendation *and* the applicant's law school education prior to his last offense to suggest otherwise. Curiously, the majority makes no attempt whatever to articulate any distinction justifying the opposite dispositions of these two admission applications.

It does not do to forget that the quality of honesty is fundamental to the legal profession.

> The relationship existing between an attorney and his client is one that of necessity requires mutual trust and confidence. It is of prime importance not only to the parties themselves, but also to lawyers as a group as well as to society in general, that there be no lessening of the degree of confidence that the public has in the fidelity, honesty and integrity of members of the profession. It has been im-

memorially acknowledged that at the very heart of the attorney-client relationship is the trust concept with the attorney acting as a trustee for his client in all of his undertakings for him. [*Bar Ass'n v. Marshall,* 269 Md. 510, 518-19, 307 A. 2d 677, 682 (1973).]

Nor does it do to overlook this Court's ultimate responsibility to assure the public of the integrity of all persons practicing law in this State, since "[g]iven that each individual member of society does not have sufficient personal knowledge of an attorney to determine trustworthiness, the bar must guarantee that all of its members merit the client's undiscerning reliance." Comment, *Discipline of Attorneys in Maryland,* 35 Md. L. Rev. 236, 252 (1975). I am simply unwilling, absent compelling circumstances, to offer such a guarantee with regard to a person who steals, be it on a grand or small scale, after the completion of a legal education.

For those who may disagree with my conclusion that the applicant's thievery precludes him from joining the legal profession, I offer a second reason: the determination by the Board of Law Examiners that the applicant's explanations to the Board of his second theft were lacking in candor. Total frankness throughout the application procedures is, so far as I am concerned, a sine qua non for admission to the Bar. And unless we are to usurp one of the primary functions the Board was created to perform, a determination of fact by it — particularly one depending so greatly upon the demeanor of a witness — should not be set aside unless clearly erroneous. *See Bar Ass'n v. Marshall, supra* at 515-16 [680].[3]

---

3. The majority apparently believes that, because Rule 4 c of the Rules Governing Admission to the Bar of Maryland provides that proceedings in this Court shall be heard upon the records made by the character committee *and* the Board, the Court, where those two bodies have made opposing determinations as to the credibility of a witness, may accept either determination. This is hardly the intent of the rule, which I do not think alters in any way our conclusion in Character Committee v. Mandras, 233 Md. 285, 288, 196 A. 2d 630, 631 (1964), that it is the Board's findings, and not the character committee's, which are "presumptively correct or at least entitled to weight where based upon the testimony of witnesses whose credibility may be in issue." It simply makes no sense to provide that the Board may conduct a de novo hearing on an application for admission, subsequent to that held by the character committee and even in a case where the committee

The Board of Law Examiners in this case was "not persuaded of the sincerity of [the] applicant in describing the [theft of the tape measure] as being a symbolic act," and concluded that "in his testimony . . . [the] applicant was less than candid." The majority recognizes that the Board "simply did not believe that the act of theft was a symbolic one . . . ." *Ante* at 691. To say this is simply to say that the Board did not believe that the applicant, who was under oath, was speaking the truth *then and there.* However, while recognizing that "no moral character qualification [for bar membership] is more important than truthfulness and candor," *ante* at 692, the majority inexplicably concludes that the Board "afforded controlling weight to that part of the applicant's testimony" — the portion of his testimony the Board *did not believe* — and gave "insufficient consideration to his *present* moral character and the evidence of his rehabilitation" since the 1971 theft. *Ante* at 691 (emphasis added). Well might the Board have "afforded controlling weight" to testimony from an applicant before it when the Board does not believe that the prospective lawyer is telling the truth. The day upon which the Board recommends to this Court the admission to the Bar of a person in whose candor and truthfulness the Board itself does not believe — the day the Board affirms the *present* moral character of a person while at the same time doubting the sincerity of the very statements that person makes to it — will indeed be a day upon which the Board stands the law upon its head. However many letters there may be attesting to the applicant's present

---

recommends admission, and then to suggest that credibility determinations of these two bodies are entitled to equal weight.

*Some* entity must have the last word on the question of the credibility of witnesses, including the applicant, since that is a matter — so greatly dependent as it is on demeanor — which simply *cannot* be decided by this Court on only the written records. On such a question, this Court should not arbitrarily accept whichever determination supports the result it chooses to reach. There is no question, of course, that the *conclusions* drawn from the evidence as to the applicant's present moral character, either by the Board or by the committee, are *not* presumptively correct, and that this Court is to make an independent evaluation of the applicant's present moral character based on the records made by both the Board and the committee. That, however, is a far cry from suggesting, as the majority seems to do, that our conclusion in *Mandras* — that a specific *finding of fact* by the Board based on credibility is entitled to weight — is no longer viable.

good moral character, and however unblemished his record may be since his Montgomery County theft — all this is not worth one whit, and should not be, when the Board weighs it against its present perception that the candidate is not, even as he testifies before them, speaking the truth.

The Court here concludes from a cold record that the applicant "is deeply distressed that he participated in such conduct," *ante* at 691, and that he "genuinely entertain[ed] the beliefs which he then espoused," *ante* at 692, *i.e.*, that stealing the tape was an act symbolic of his disrespect for American institutions, false American ideals, and the like. The majority asserts that the Board's conclusion — that the applicant lied about his reasons for the 1971 shoplifting — was based on the "flimsy foundation" of its inability to understand the applicant's shoplifting in the social and historic context urged by the applicant. *Ante* at 692. To this remarkable statement there are two responses: The first is to inquire of the majority as to *its* foundation, flimsy or otherwise, for reaching the contrary conclusion, on only an inanimate record, that the applicant *did* in fact genuinely entertain those beliefs and was thus speaking the truth to the Board of Law Examiners. The majority apparently concludes that, since the applicant has not been shown to have stolen anything since 1971, has freely admitted his previous thefts and that they were morally wrong and indefensible, and has produced the testimony of reputable witnesses as to his present good moral character, he simply cannot have been lying about the reasons for the 1971 theft. I fail to perceive how this foundation for believing the applicant is any less "flimsy" than the Board's bases for not believing him.

The second response is simply to point out that in fact the Board's conclusion that the applicant was dissembling about his reasons for the 1971 theft no more rests on a "flimsy foundation" than does any fact finder's conclusion as to a witness' credibility. The Board had the benefit of the applicant's personal appearance and testimony before it. In addition, it would certainly not have been unreasonable for the Board to find the justification offered by the applicant, particularly when coupled with its opportunity to observe his

demeanor while testifying, inherently unworthy of belief — not because illegal acts are never performed to symbolize disaffection for the system, but simply because "symbolic acts" are not, as here, performed in secrecy for the benefit of the actor only, nor are they disavowed when brought to public attention. Indeed even the applicant's own very able counsel observed that it would be difficult to credit his client's statements in this regard.[4] It appears to me from merely reading the written record of the applicant's testimony that the Board could properly conclude that he stole the tape measure for no other reason than that he wanted it, and his protestation that his theft was a symbolic act was simply a *post hoc* rationalization for an incident for which there exists no legal or moral justification.

Be all that as it may, the majority is quite correct when it says that the mere fact that the Board and this Court do not understand the applicant's motives does not mean that he did not genuinely entertain the beliefs he expressed. The point, however, is that it is only the Board, and not this Court, which is in any position to determine whether he genuinely entertained those beliefs. The Board concluded that he did not. For the majority to reach a contrary conclusion without an examination of the applicant being conducted in its presence is simply unconscionable for a Court whose obligation it is to assure the public, following a proper investigation, that it has no reason to doubt the honesty and integrity of each person it admits to the Bar. It hardly need be added that the Board's role — if, after this decision, it has a role — in determining the moral fitness of a prospective attorney to practice law cries out for immediate clarification.

I am authorized to add that Judge Smith and Judge Orth concur in the views I have just expressed.

---

4. I quote from the attorney's remarks as recorded in the transcript of the applicant's hearing before the character committee: "If, of course, you do not credit his present statements, *and I know no reason why you should,* although I certainly do, then, of course, you will disagree with me in what I am suggesting to you." (Emphasis added.)