ENGLAND, Chief Justice, and OVER-TON, Justice.
The petitioner, G. W. L., applied for admission to The Florida Bar and received a passing score on the bar examination. The Florida Board of Bar Examiners, acting as our agent for the admission process,[1] undertook an investigation into his character, fitness, and general qualifications to practice law in the state.[2] The Board refused to recommend G. W. L. for admission to the Bar, and he now petitions this Court for admission. We allowed argument because this petition raises a matter of general importance in the admission process, specifically the effect of a bankruptcy petition on a Bar applicant’s fitness to practice law. We agree with the recommendation of the Board and decline to admit the petitioner on the facts and circumstances in the record in this case, but this affirmance is without prejudice and the petitioner may seek a further hearing to offer additional evidence of his present good moral character.
To understand the ramifications of our decision today, it is necessary to recount the events surrounding the petitioner’s discharge in bankruptcy. In doing so, it must be with the recognition that it is not the act of filing for bankruptcy but the circumstances surrounding this particular bankruptcy application that demonstrate a lack of good moral character and justify the Board’s decision.
*456 G. W. L. completed his secondary education in the northeast and attended an eastern university from September, 1969, until June, 1973. During that period he received approximately $1,900 in 3V2% interest student loans from the university, which amount was to be repaid within ten years after the termination of his status as a full-time student. In September, 1973, the petitioner entered law school. To finance his legal education, he borrowed approximately $2,500 per year from a bank under a government-sponsored 7% interest student loan program. Similar ten-year repayment terms were agreed upon. When he received his Juris Doctor degree in May, 1976, G. W. L.’s financial obligations totaled $9,893. Initial payments were scheduled to begin nine months after graduation with the bulk of the payments not due for three years. There were no exceptional financial problems or identified misfortunes, and the obligations appeared normal for any student attending undergraduate and graduate educational programs on student loans.
For some months prior to his graduation, G. W. L. attempted unsuccessfully to find legal employment locally. On May 19,1976, he simultaneously filed with the Board a late student registration, and an application to take the bar examination in Florida.[3] He also arranged several job interviews in southwest Florida where his parents reside. His initial efforts to secure employment in Florida, however, proved fruitless. On May 20, 1976, three days prior to his graduation from law school, the petitioner executed a voluntary petition for bankruptcy which he filed in the appropriate United States District Court on May 26, 1976. With the exception of one debt in the amount of $8.01, none of the debts listed in his petition were due at the time of filing.
In June, 1976, G. W. L. concluded his personal participation in the bankruptcy proceedings and moved to Florida. He made informal arrangements with the court-appointed trustee to defer action on his petition for discharge for six months, allegedly with the understanding that if he could find a job and begin repaying his creditors he would voluntarily withdraw the bankruptcy petition. Nevertheless, the petition was granted on December 20, 1976, and by order of the bankruptcy court the petitioner was adjudged bankrupt and released from all his debts. Coincidentally, G. W. L. secured employment as a law clerk in a law office in Florida on December 20, 1976, at a wage of $70 per week.
G. W. L. passed the July, 1976, Florida bar examination and the customary background investigation was undertaken. During the course of the investigation, the Board discovered the bankruptcy petition and undertook a more extensive investigation of his activities in connection with that action. By letter of December 6, 1976, the Board notified the petitioner that it wished to inquire into the circumstances surrounding the filing of his voluntary petition for bankruptcy and requested that he appear before the Board in regard to that matter. An informal hearing was held on January 14, 1977, at which G. W. L. appeared, answered questions, and offered his explanation of the matter.
On January 19, the Board notified G. W. L. that it had decided to defer final consideration of his application to permit further investigation. Immediately following the hearing G. W. L. made arrangements for repayment of the debts discharged by the bankruptcy order of December 20, 1976. On February 20, specifications were drawn and served on the petitioner, advising him of the Board’s intent to base its findings and conclusions on the testimony elicited at the informal hearing and informing him of his right to a formal hearing at which he would be entitled to be represented by counsel, to present evidence, to question witnesses, and, if necessary, to use the Board’s subpoena power to secure the attendance of witnesses.[4] The petitioner responded to the specifications by letter dated March 8, 1977, in which he expressly declined a formal hearing and agreed to a *457 determination of his application on the basis of facts then before the Board. The letter also advised the Board that he had secured employment as a law clerk and had voluntarily resurrected his discharged debts.
Within thirty days after receiving the letter, the Board recommended against petitioner’s admission to the practice of law. After rejecting a request for reconsideration, the Board notified G. W. L. of its action by letter dated September 14, 1977. On November 14, the petitioner filed his petition for admission with this Court. The Board submitted a response to the petition on December 16, 1977, and we heard arguments on the matter in chambers on February 6, 1978.
The critical inquiry in this case is whether the manner in which the petitioner voluntarily secured a discharge of his debts in bankruptcy justifies a finding of a lack of good moral character sufficient to make him unfit to practice law in Florida. The Board found that his activities proved him unfit to practice law, based on the following indicia:
(1) The petitioner had worked each summer during undergraduate school and two of the three summers during law school. At the time he prepared his bankruptcy petition, he had not fully tested the Florida job market either as to law-related employment or other jobs commensurate with skills he had earlier developed.
(2) The petitioner explained to the Board that his decision to consider practice in Florida was made after April, 1976, when his car broke down and was sold. This explanation was contradicted by evidence that he considered entering the practice of law in Florida at least as early as February, 1976, when he wrote to the Board for bar admission forms. His parents had lived in Florida for some years before that date.
(3) The petitioner suggested that his motivation for bankruptcy was in part pressure from creditors, particularly in the form of certain “dunning” letters that he allegedly received from bank lenders and from the newspaper with which he had advertised the sale of his car. His debt to the newspaper in the amount of $8.01 was incurred in April, 1976, one month before his bankruptcy petition was filed. The petitioner could not produce copies of the dunning correspondence to which he referred, indicating that he had destroyed those received from lending institutions. The Board found his claim of being driven to bankruptcy by “pressure” from his $8 one-month-old debt or his unmatured student loan obligations unbelievable.
The petitioner argues for admission essentially on two grounds, one legal and the other factual. First, he asserts that bankruptcy is a statutory right, available.to all persons in this country not only for the benefit of the bankrupt but also for the benefit of the general public.[5] Therefore, he claims that a bar applicant’s exercise of the statutory right cannot be said to reflect adversely on the character or fitness of the applicant. Second, he asserts that his decision to act before his significant debts became due was neither a fraud on his creditors nor otherwise morally reprehensible. Although the petitioner concedes that it would have demonstrated a lack of the requisite character and fitness to have contracted for the debts with the concurrent intention to file for bankruptcy and avoid their repayment, he argues that neither the Board’s charges nor the record shows that he had any such preconceived intent.
The Board’s position on the petitioner’s admission application rests on the premise that while the filing of a petition in bankruptcy is lawful and does not of itself demonstrate a lack of fitness, conduct that is not unlawful may nevertheless fall short of the standards of moral character which must be met before one is qualified for admission to the bar. The Board recommends that this Court follow the view of the Oregon Supreme Court that: “Legality is beside the point. The issue is applicant’s sense of ethics.” Application of Alpert, 269 Or. 508, 514, 525 P.2d 1042, 1045 (1974). It insists that its rejection of the petitioner’s *458 application was based on the circumstances surrounding his filing the bankruptcy petition rather than on the election to file itself. As factual support for its conclusion, the Board points out that the petitioner formed his intent to obtain a discharge before graduating from law school, long before the major debts were due, and apparently because (according to his testimony) he “found it an unfortunate but practical way of getting out of this awful situation of having no money and an awful lot of debts. ...”
The Court, under its constitutional authority to “regulate the admission of persons to the practice of law,” has the authority to require proficiency in the law and good moral character before it admits an applicant to practice before the courts of this state. The sole purpose of these requirements is to protect the public. The petitioner in the instant case had demonstrated his proficiency by passing the required bar examination. The issue before us is whether he has established his good moral character, taking into consideration the facts and circumstances under which he sought bankruptcy.[6]
The term “good moral character” has no absolute definition. See Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957). One definition would require that only conduct or acts which historically constitute an act of moral turpitude justify a finding of a lack of good moral character. This Court in State ex rel. Tullidge v. Hollingsworth, 108 Fla. 607, 611, 146 So. 660, 661 (1933), defined moral turpitude as follows: “Moral turpitude involves the idea of inherent baseness or depravity in the private social relations or duties owed by man to man or by man to society. . . .” Recently we expressed the view that issuing a worthless check without the intent to defraud was not an offense of moral turpitude but it was unethical conduct for a member of the bar. The Florida Bar v. Davis, 361 So.2d 159 (Fla.1978). Such conduct was the subject of bar discipline in the Davis case, and the lawyer was suspended for twelve months.
In our view, a finding of a lack of “good moral character” should not be restricted to those acts that reflect moral turpitude. A more appropriate definition of the phrase requires an inclusion of acts and conduct which would cause a reasonable man to have substantial doubts about an individual’s honesty, fairness, and respect for the rights of others and for the laws of the state and nation. See Konigsberg, supra.
As we noted in Florida Board of Bar Examiners Re Eimers, 358 So.2d 7 (Fla.1978), the nature of the practice of law provides the unscrupulous attorney with frequent opportunities to defraud the client or obstruct the judicial process. It is our constitutional responsibility to protect the public by taking necessary action to ensure that the individuals who are admitted to practice law will be honest and fair and will not thwart the administration of justice. In our view, a definition of good moral character which limits an adverse finding to those acts which constitute an offense evincing moral turpitude is inadequate because, as we have held in bar disciplinary matters, it would not sufficiently protect the public interest. The Florida Bar v. Davis, supra. The inquiry into good moral character which emphasizes honesty, fairness, and respect for the rights of others and for the laws of this state and nation is a proper and suitable standard for those who desire to be an integral part of the administration of justice in the courts of this state. We recognize, as we did in Eim-ers, supra, that the standard of conduct required of an applicant for admission to the bar must have a rational connection to the applicant’s fitness to practice law, and the standard must be applied with that limitation in mind or the term “good moral character” could become “a dangerous instrument for arbitrary and discriminatory denial of the right to practice law.” Florida Board of Bar Examiners Re Eimers, 358 So.2d 7, 9 (Fla.1978) (quoting Konigsberg *459 v. State Bar of California, 353 U.S. 252, 262-63, 77 S.Ct. 722, 728, 1 L.Ed.2d 810, 819 (1957)).
We must now determine two issues. First, are the facts in this case such that a reasonable man would have substantial doubts about the petitioner’s honesty, fairness, and respect for the rights of others and for the laws of the state and nation? Second, is the conduct involved in this case rationally connected to the petitioner’s fitness to practice law?
In our view, both questions must be answered in the affirmative. We find that the Board had ample record evidence from which it could conclude that the principal motive of the petitioner in filing his petition for bankruptcy was to defeat creditors who had substantially funded seven years of educational training.[7] Whether that motive was present as the debts were incurred or was formed toward the end of his law school training, the Board could fairly conclude from the petitioner’s own testimony and prior behavior that he exercised his legal right to be freed of debt by bankruptcy well before the first installments on his debt became due, with absolutely no regard for his moral responsibility to his creditors. The petitioner’s admittedly legal but unjustifiably precipitous action, initiated before he had obtained the results of the July bar examination,[8] exhausted the job market, or given his creditors an opportunity to adjust repayment schedules, indicates a lack of the moral values upon which we have a right to insist for members of the legal profession in Florida. The petitioner’s course of conduct in these personal affairs raises serious questions concerning the propriety of his being a counselor to others in their legal affairs, and is rationally connected to his fitness to practice law.
The fundamental purposes of the federal bankruptcy act are to facilitate the rehabilitation of the bankrupt debtor and to provide a means for equitable distribution of the bankruptcy assets among his or her creditors. At an early date in the history of the act, it was construed to “relieve the honest debtor from the weight of indebtedness which has become oppressive, and to permit him to have a fresh start in business or commercial life, freed from the obligation and responsibilities which may have resulted from business misfortunes.” Wetmore v. Markoe, 196 U.S. 68, 77, 25 S.Ct. 172, 176, 49 L.Ed. 390, 394 (1904). Although the discharge bars the underlying legal remedy for collecting a debt, the underlying moral obligation to repay the debt remains and in fact constitutes sufficient consideration to make a subsequent reaffirmation legally enforceable. Kesler v. Department of Public Safety, 369 U.S. 153, 170, 82 S.Ct. 807, 817, 7 L.Ed.2d 641, 653 (1962); Silva v. Robinson, 115 Fla. 830, 156 So. 280 (1934).
The record before us reflects that the petitioner suffered no unusual misfortune or financial catastrophe prior to his filing the bankruptcy petition. His position was no different than that of other students who used student loans to obtain and complete their education. Although he did not have employment at the time of his graduation and for six months thereafter, the student loans were not yet due and for the most part would not be due for at least a year. In our view, his filing of the bankruptcy petition showed a disregard not only for the rights of his creditors but also for future student loan applicants. The filing of the bankruptcy petition was not illegal, but in our view it was done in such a morally reprehensible fashion that it directly affects his fitness to practice law.
*460 To foreclose any misconstruction of this decision, we must emphasize that this ruling should not be interpreted to approve any general principle concerning bankruptcies nor to hold that the securing of a discharge in bankruptcy is an act inherently requiring the denial of admission to the bar. We further do not wish this decision to be construed to hold that any comparable exercise of a clear legal right will necessarily imperil bar admission.[9]
In making our final determination in this case, we cannot ignore the fact that the action of this individual was not unusual conduct in his graduation year. In 1976 there were 8,461 bankruptcy petitions filed by college graduates in order to eliminate legal responsibility for student loans. The number was sufficient to move Congress to amend the bankruptcy act to limit the circumstances under which an adjudication of bankruptcy will operate to discharge federally insured student loan obligations. 20 U.S.C.A. § 1087-3 (1978). See State v. Wilkes, 41 N.Y.2d 655, 394 N.Y.S.2d 849, 363 N.E.2d 555 (1977). Student loan bankruptcies have resulted in litigation elsewhere. E. g., Girardier v. Webster College, 563 F.2d 1267 (8th Cir. 1977); Handsome v. Rutgers University, 445 F.Supp. 1362 (D.N.J.1978). A concurring judge in the Girardier case expressed his view on the “fresh-start” purpose of the bankruptcy act as it pertains to student loan bankruptcies thusly: “[AJppellants have obtained far more than the fresh start contemplated by the Bankruptcy Act — they have obtained a head start because each has secured something of value that cannot be lost or taken away and which will give each appellant a continuing, lifelong economic benefit. . . .” 563 F.2d at 1278.
We find the conduct of the petitioner in the instant case, although not illegal at the time, morally reprehensible. While we recognize that a significant segment of his generation behaved similarly, in our minds his conduct was clearly wrong. There may be justification for the assertion tjiat the moralities of this exercise of a clear legal right were not fully considered or understood by the young people who undertook these student loan bankruptcies. Many have now found their future professional careers tarnished or jeopardized. In bar discipline or admission matters, we customarily take into account the youth and inexperience of attorneys in considering the appropriate action and we believe we should do so in this instance.
G. W. L. waived his opportunity for a formal hearing on his moral fitness for bar admission. Therefore, he did not present other evidence of good moral character to the Board to offset the lack of good moral character indicated by his conduct leading up to the bankruptcy discharge. At a future hearing, the petitioner may be able to present evidence of good moral character to offset the circumstances now in the record.
Taking all of these factors into account, we now approve the finding of the Board of Bar Examiners, without prejudice to G. W. L. to apply for a formal hearing before the Board to present evidence of his present good moral character.
It is so ordered.
SUNDBERG and ALDERMAN, JJ„ concur.
HATCHETT, J., concurs in part and dissents in part with an opinion.
BOYD, J., dissents with an opinion, with which ADKINS, J., concurs.

. Our authority to admit attorneys to practice in Florida derives from Article V, Section 15 of the Florida Constitution. The Board’s authority derives from the Rules of the Supreme Court Relating to Admissions to the Bar (1975 Revision), Article I, Section 2, 32 Fla.Stat.Ann. 273 (Supp.1978).

. Fla.Sup.Ct.Bar Admiss.Rule, art. II, § 12.

. Fla.Bd.Bar Exam. Rule I, § 1.

. Fla.Sup.Ct.Bar Admiss. Rule, art. II, § 12.

. Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230, 1235 (1934).

. Fla.Sup.Ct.Bar Admiss.Rule, art. IV, § 19.

. With respect to his undergraduate education, the petitioner testified: “I went to school for practically nothing out of my own pocket at [an eastern university].”

. G. W. L. at one point claimed that his law-related employment overtures were not favorably received because his law school was new and unknown to Florida attorneys and that several prospective employers wanted to await his admission to the bar before hiring him. He has offered no explanation why, if that was the case, he did not withdraw his bankruptcy petition when, during the six-month “holding” period which he had arranged in the fall of 1976, he learned that he had passed the July bar examination.

. Although not precisely germane to this proceeding, we agree with the petitioner that unfitness is demonstrated if it can be shown that an applicant formed an intent not to repay debts when the debts were incurred.