# CRIMINAL JUSTICE STANDARDS AND TRAINING COMMISSION v GORMAN
## Case No. 85-3590
State of Florida, Division of Administrative Hearings
April 3, 1986

## APPEARANCES OF COUNSEL

**Joseph S. White** for petitioner.
**Wayne R. McDonough** for respondent.

## OPINION

DONALD R. ALEXANDER, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, the above matter was heard before the Division

of Administrative Hearings by its duly designated Hearing Officer, Donald R. Alexander, on February 4, 1986 in Fort Pierce, Florida.

## BACKGROUND

By administrative complaint filed on September 24, 1985, petitioner, Criminal Justice Standards and Training Commission, has charged that on May 28, 1985, respondent, Thomas F. Gorman, Jr., who is certified as a law enforcement officer by petitioner, "did agree with Kristina Coleman to engage in sexual intercourse with her in Kristina Coleman's apartment while the respondent was on duty as a Vero Beach police officer." Petitioner contends that by engaging in the foregoing conduct, respondent violated Subsection 943.1395(5), Florida Statutes (1985), in that "respondent failed to maintain the qualifications established in Section 943.13(7), Florida Statutes, which require that a law enforcement officer in the State of Florida have good moral character." Petitioner proposed to revoke Gorman's law enforcement certification for his alleged improprieties.

Respondent disputed the above allegations and requested a formal hearing pursuant to Subsection 120.57(1), Florida Statutes (1985). The matter was referred to the Division of Administrative Hearings by petition on October 18, 1985, with a request that a hearing officer be assigned to conduct a formal hearing. By notice of hearing dated December 16, 1985, the final hearing was scheduled for February 4, 1986 in Fort Pierce, Florida.

At final hearing the parties stipulated to certain facts set forth below, and accordingly no live testimony was presented. Petitioner also offered petitioner's exhibit 1 which is a tape recording of conversations between respondent and Kristina Coleman. A ruling on its admissibility was reserved pending the filing of post-hearing memoranda by the parties.

The transcript of hearing was filed on March 3, 1986. Post-hearing filings were made by petitioner and respondent on March 18 and 24, 1986, respectively, and have been considered by the undersigned in the preparation of this order.[1]

At issue is whether respondent's certification as a law enforcement officer should be disciplined for the alleged statutory violations set forth in the administrative complaint.

---

[1] Although the parties agreed to file legal memoranda, petitioner also submitted proposed findings of fact. They have been ruled on in the Appendix attached to this Recommended Order.

Based upon all of the evidence, the following finds of fact are determined:

## FINDINGS OF FACT

1. At all times relevant hereto, respondent, Thomas F. Gorman, Jr., was certified as a law enforcement officer by petitioner, Criminal Justice Standards and Training Commission, having been issued Certificate No. 02-33145 on March 22, 1983. When the event herein occurred, Gorman was employed as a police officer for the City of Vero Beach.

2. On an undisclosed date in 1985, but prior to May 28, 1985, the husband of Kristie Coleman made a complaint with the Vero Beach Police Department (VBPD) that his eighteen year old wife had been sexually harassed by a black police officer. After being told the City had no black police officers, the husband then apparently identified respondent, who is white, as being the culprit. An investigation of the husband's complaint was conducted by the VBPD, but it was unable to "verify" the charges.

3. The VBPD then decided to initiate a separate investigation of respondent. To do so, it solicited the aid and assistance of Kristie Coleman, who, at the insistence of the chief of police, agreed to wear a concealed microphone on her person. The purpose of the microphone was allegedly to investigate and intercept evidence of a criminal act on the part of Gorman. Kristie was instructed to stand outside her apartment whenever she saw respondent drive by in his police car so as to make herself visible to respondent. The police chief was explicit in his instructions that their encounter take place while Gorman was on duty. At the same time, two surveillance teams were placed on or near Kristie's premises, one in her bedroom and the other outside her apartment, and they activated recording equipment designed to monitor and record conversations between the two. She was also instructed to tell Gorman that she had to use the bathroom if he entered her apartment and placed a hand on her leg. This was a predetermined signal to the surveillance team to enter the room and make their presence known to Gorman. There was no court order approving the use of the concealed microphone.

4. At approximately 6:38 p.m. on May 28, 1985, respondent drove by Kristie's apartment. It is stipulated that respondent was in uniform and on duty at that time. Upon seeing Kristie emerge from her apartment, Gorman stopped and the two began a conversation. During the course of the evening Gorman left the premises and returned six

separate times after the first visit at 6:38 p.m. These return visits occurred at 7:08 p.m., 7:34 p.m., 8:22 p.m., 8:59 p.m., 9:04 p.m. and 9:20 p.m. However, it was not until the seventh visit that Gorman actually entered Kristie's apartment. On each visit, their conversations were recorded by the hidden microphone worn by Kristie. The transcript of the conversation was not transcribed by the parties, and portions of the recorded conversation are inaudible due to external noises such as traffic and the engine noise of respondent's vehicle.

5. As a result of the VBPD surveillance activities, respondent was offered a choice of being terminated from the police force or voluntarily resigning. Gorman chose the latter. The administrative complaint herein was then filed by petitioner thereby prompting the formal hearing in this matter. It charges that Gorman "did appear with Kristina Coleman to engage in sexual intercourse with her in Kristina's apartment while the Respondent was on duty as a Vero Beach police officer."

6. The tape reveals that Gorman and Coleman had known each other, at least by sight, prior to May 28, 1985. The two had also recently met when Gorman, while on duty, stopped Coleman one evening for a suspected moving violation. However, she was not ticketed by Gorman, and at that time Coleman told Gorman she wanted to see him again. Throughout the tape recorded meetings on May 28, Coleman repeatedly attempted to get Gorman to acknowledge that he had not given her a ticket in return for sexual favors. Gorman denied this was true each time the subject was raised, and there is no evidence to indicate that this was the case.

7. As noted earlier, the tape recording is not of the highest quality, and several parts of the conversation are either inaudible or partially obscured by other noises. Nonetheless, the following relevant facts are found from the more than one hour of recorded conversations, most of which were nothing more than casual conversation between the two. After several return visits to her apartment that evening, Gorman made several flattering comments to Kristie, such as how "beautiful" she was, that she had a nice personality, and how Gorman was attracted to her. Gorman asked if he could see her after he was off-duty, but Kristie declined. As the evening wore on, Kristie told Gorman that her sister would arrive at her apartment at 11:00 p.m. to spend the night, and that the few hours before 11:00 p.m. would be the "only time" she had to meet with him. Although Gorman was reluctant to go to her apartment while on duty, Kristie told him that once she got "start," she wanted Gorman to finish the job. She also asked him if he was "too chicken-shit to come into (her) house." On

264

his last visit to her apartment that evening, Gorman accepted her offer to come into the apartment. After taking off his gun and holster at Kristie's request, and declining an offer of a beer from Kristie, Gorman then said what appears to the undersigned to be "Let's do it." Kristie than gave the predetermined signal to the surveillance team to enter the room. No sexual intercourse occurred and there is no evidence that respondent was charged with violating any state or municipal law by the foregoing conduct.

8. There was no specific reference to sexual intercourse in the conversations, although it can be reasonably inferred that Kristie was suggesting this to Gorman, and that he intended to accept her offer.

9. There was no evidence that Gorman's conduct constituted what the agency perceived to be a lack of good moral character within the meaning of its rules or governing statutes.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction of the subject matter and the parties thereto pursuant to Subsection 120.57(1), Florida Statutes (1985).

2. Respondent is charged with violating Subsection 943.1395(5), Florida Statutes (1985), by virtue of his failing to maintain the qualifications in Subsection 943.13(7), Florida Statutes (1985). The latter subsection requires a law enforcement officer to have "good moral character." The lack of "good moral character" stems from the allegation that Gorman "did agree with Kristina Coleman to engage in sexual intercourse with her in Kristina Coleman's apartment while Respondent was on duty as a Vero Beach police officer."

3. Petitioner's exhibit 1 is hereby received in evidence. By stipulation of counsel, the parties have agreed that the purpose of the intercepted conversations was to obtain evidence of a criminal act. This was not controverted by respondent. Therefore, Subsection 934.03(2)(c), Florida Statutes (1985), authorizes such a recording even though no evidence of a criminal act was actually obtained.

4. Two issues are raised by the complaint. First, did respondent agree to have sexual intercourse with Kristina Coleman while on duty as a police officer? Secondly, if he did, does that conduct equate to a lack of "good moral character" within the meaning of Subsection 943.13(7)?

The evidence reveals that although the words "sexual intercourse" or their equivalent were never specifically mentioned by Gorman or Kristina, it may be inferred from their conversations that Gorman,

with Kristina's urging, entered her apartment for that purpose. Therefore, the first allegation in the complaint has been established.

5. The second question is whether that conduct constitutes a lack of good moral character so as to render Gorman ineligible to hold a law enforcement certification. Unquestionably, Gorman exhibited a lack of good judgment in his meeting with Kristie on May 28, and such conduct most likely violated internal rules of conduct promulgated by his employer. However, the questioned conduct falls far short of constituting a lack of good moral character for purposes of decertifying respondent.

6. The term "good moral character", as it appears in Section 943.13, is not defined, and the agency has pointed to no decisional law, agency precedent or rules which define the term. However, some insight into the meaning of the term is provided by Rule 11B-27.011(2), Florida Administrative Code. That rule reads as follows:

(2) For the purpose of revocation pursuant to Section 943.1395(5), F.S., the employing agency shall forward to the Commission a report in accordance with procedures established in Rule 11B-27.03 when:

(a) An officer has been found guilty of violating Sections 790.17, 790.18, 790.24, 790.27, 796.06, 796.07, 800.02, 800.03, 812.014(2)(c), 812.016, 812.081, 817.035, 817.235, 817.39, 817.49, 817.563, 827.04(2)(3), 827.05, 828.122, 831.31(1)(b), 832.041, 832.05(2), 837.05, 837.06, 843.02, 843.13, 843.17, 847.011(1), (2), (4), 847.0125(2), 847.013(2), 847.06, 847.07, 870.01, 870.02, 876.17, 876.18, 893.13(1)(a)3., (1)(d)3., (1)(f), (2)(a)1., or (2)(b), F.S.

(b) An officer has perpetrated any act which would constitute a felony or an offense under subsection (2)(a) of this rule, or *committed an egregious act which establishes that the officer is not of good moral character.* (Emphasis added)

Since Gorman has not been found guilty of any criminal act, paragraph (a) has no application. Similarly, it has not been shown that his conduct constitutes a felony or an offense under subsection (2)(a) of the rule. Paragraph (b) requires that an officer commit "an egregious act which establishes that the officer is not of good moral character." The word "egregious" is defined in Webster's Dictionary as "remarkable . . . extraordinary (and) . . . flagrant." *Webster's New Twentieth Century Dictionary*, Unabridged Second Edition (1979). With this in mind, it is concluded that Gorman's acquiescence to Kristina's repeated invitations to enter her apartment for sexual purposes cannot be considered such a remarkable, extraordinary or flagrant act as to establish a lack of good moral character. Further, there is no evidence

266

that the agency construes such conduct to be a violation of this rule. Compare, *Anheuser-Busch, Inc. v. Department of Business Regulation*, 393 So.2d 1177 (Fla. 1st DCA 1981); *Bowling v. Department of Insurance*, 394 So.2d 165 (Fla. 1st DCA 1981). Therefore, no violation of the rule has occurred.

7. Recent case law dealing with the term "moral character" also supports a dismissal of the charges. In *Zemour, Inc. v. State of Florida, Division of Beverage*, 347 So.2d 1102 (Fla. 1st DCA 1977), the Court construed the term "moral character," as it appears in Section 561.15, Florida Statutes, as follows:

Moral character, as used in this statute, means not only the ability to distinguish between right and wrong, but the character to observe the difference; the observance of the rules of right conduct, and conduct which generally acceptable to the populace for positions of trust and confidence. *An isolated unlawful act or acts of indiscretion wherever committed do not necessarily establish bad moral character.* But, as shown by the evidence here, repeated acts in violation of law wherever committed and generally condemned by law abiding people, over a long period of time, evinces the sort of mind and establishes the sort of character that the legislature . . . has determined should not be entrusted with a liquor license. (Emphasis added)

See, also, *Florida Board of Bar Examiners, Re: G.W.L.*, 364 So.2d 454 (Fla. 1978) (good moral character defined as "acts and conduct which would cause a reasonable man to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws of the state and nation."); *Bachynsky v. State, Department of Professional Regulation, Board of Medical Examiners*, 471 So.2d 1305 (Fla. 1st DCA 1985) (isolated conviction not rationally related to practice of medicine insufficient to establish a lack of good moral character on part of applicant for medical doctor's license). *White v. Beary*, 237 So. 2d 263 (Fla. 1st DCA 1970), is also pertinent for it holds that "(w)hat constitutes good moral character is a matter to be developed by facts, (and) evaluated by the agency." *Id*. at 266.

8. The following broad principles can be gleaned from the foregoing decisions. First, isolated acts of indiscretion do not necessarily establish a lack of good moral character. Secondly, the conduct must cause substantial doubts about the individual's honesty, fairness and respect for rights of others. Finally, the act must rationally relate to the person's profession. Applying the facts to these principles, it is concluded that Gorman's conduct on May 28,1985 was "(a)n isolated . . .

act of indiscretion." Even though he agreed to have sexual intercourse with a person who used all measures of persuasion to entice him into that course of conduct, Gorman's conduct was not such as to "cause a reasonable man to have substantial doubts about (his) honest, fairness, and respect for the rights of others and for the laws of the state and nation." Finally, it cannot be said that the questioned conduct was "rationally related to the (law enforcement profession)" even though it occurred during on-duty hours. Therefore, there is an insufficient factual predicate to equate Gorman's conduct to a lack of good moral character within the meaning of Subsection 943.13(7), Florida Statutes (1985). This being so, it is concluded that no violation of Subsection 943.13(7) has occurred.

9. In view of the above conclusions, it is unnecessary to reach the issue raised by Gorman concerning entrapment on the party of the City of Vero Beach Police Department.

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, it is

RECOMMENDED that the administrative complaint filed against Thomas F. Gorman, Jr. be DISMISSED with prejudice.

DONE and ORDERED this 3rd day of April, 1986, in Tallahassee, Florida.