# Supreme Court of Florida

_____

No. SC11-2568

_____

**FLORIDA BOARD OF BAR EXAMINERS RE: QUESTION AS TO WHETHER UNDOCUMENTED IMMIGRANTS ARE ELIGIBLE FOR ADMISSION TO THE FLORIDA BAR.**

[March 6, 2014]

PER CURIAM.

The Florida Board of Bar Examiners ("Board") has filed a petition requesting an advisory opinion to provide it guidance in determining the eligibility for admission to The Florida Bar of a current applicant, who is an unauthorized immigrant, and future similarly situated applicants. The Board has presented the following question: Are undocumented immigrants eligible for admission to The Florida Bar?[1] We have jurisdiction. See art. V, § 15, Fla. Const.[2]

_____

1. In the present case, the issue is not the admission of a particular applicant, it is a request for an advisory opinion regarding a clearly stated question. The separate issue of the current applicant's admission is not before the Court. See Fla. Bd. Bar Exam'rs Re: Question, No. SC11-2568 (Fla. Apr. 4, 2013) (order denying motion for admission). Thus, the arguments presented regarding the character and fitness of that applicant are not discussed in this opinion.

The Board states that in January 2008, it adopted a policy to require all applicants for admission to The Florida Bar to produce information pertaining to their citizenship or immigration status. The policy is based in part on a United States District Court decision, Godoy v. Office of Bar Admissions, No. 1:05-CV-0675-RWS, 2006 WL 2085318 (N.D. Ga. July 25, 2006).[3] Consistent with the federal district court's opinion, the Board requires applicants who are citizens of the United States to submit a certified copy of their birth certificate, or provide a photocopy of their certificate of naturalization or certificate of citizenship.

---

2. The Court has previously answered questions filed by the Florida Board of Bar Examiners pursuant to the Court's jurisdiction to regulate the admission and discipline of attorneys under article V, section 15, of the Florida Constitution (and that section's predecessor, article V, § 23). See, e.g., Fla. Bd. Bar Exam'rs, 581 So. 2d 895 (Fla. 1991); In re Certified Question, 361 So. 2d 424 (Fla. 1978); In re Fla. Bd. Bar Exam'rs, 350 So. 2d 1072 (Fla. 1977); In re Question Certified by Fla. Bd. Bar Exam'rs, 265 So. 2d 1 (Fla. 1972); In re Fla. Bd. Bar Exam'rs, 183 So. 2d 688 (Fla. 1966).

3. In Godoy, a permanent resident alien who had applied to the Georgia Bar sued the Georgia Office of Bar Admissions. He alleged that the Georgia Board to Determine Fitness of Bar Applicants' practice of requiring certain immigration documentation from non-citizens and "all foreign-born applicants" violated the supremacy and equal protection clauses of the United States Constitution, as well as his substantive due process rights. 2006 WL 2085318 at *1. In response, the Georgia bar examiners stated that the request for documents was designed to allow a non-United States citizen or foreign-born applicant to demonstrate that he is lawfully in the United States and will remain in legal status through the administration of the bar exam that he wishes to take. The Georgia bar examiners asserted that its interest in obtaining such proof is constitutionally permissible and substantial, in that "compliance with all laws, including immigration laws, is a standard expected of all applicants and lawyers." Id. at *4. The federal court found in favor of the Georgia bar examiners.

Applicants who are not citizens are required to provide a photocopy of the immigration document that demonstrates their status.

Currently, the Board is considering an applicant ("Applicant") for admission to The Florida Bar who is an unauthorized immigrant living in the United States. Applicant graduated from an American Bar Association accredited law school and passed The Florida Bar Examination. However, he is and continues to be an unauthorized immigrant. The Board asks the Court whether Applicant and any future similarly situated applicants are eligible for admission to The Florida Bar.[4] As explained below, we answer the question by holding that unauthorized immigrants are ineligible for admission to The Florida Bar.

The United States Supreme Court recently reiterated in Arizona v. United States, 132 S. Ct. 2492, 2498 (2012), that the "Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." The federal government has the "constitutional power to 'establish an (sic) uniform Rule of Naturalization' [resting on, in part,] its inherent power as

_____

4. Several amicus briefs have been filed arguing that Applicant and others in his situation should be admitted to membership in The Florida Bar. Applicant's counsel, the amici, and the Board asked the Court to consider various arguments presented in a case recently decided by the Supreme Court of California, In re: Sergio C. Garcia, 315 P.3d 117 (Ca. 2014). In that case, a brief filed by the United States Department of Justice set forth pertinent legal authorities regarding immigration law. By order dated April 18, 2013, this Court invited supplemental briefing, addressing specific issues, from the Department of Justice, the Florida Board of Bar Examiners, and counsel for Applicant.

sovereign to control and conduct relations with foreign nations." Id. A person's status in this country as an authorized or unauthorized alien is determined solely by federal law. That determination addresses whether the person is lawfully present in the United States. Further, Congress has enacted laws that set the terms of employment for aliens and impose civil and criminal penalties on employers who attempt to recruit or hire an unauthorized alien. See 8 U.S.C. §§ 1324-1324a (2012). Therefore, a license issued by a state cannot permit an unauthorized alien to perform work if such conduct is prohibited by federal law. "The federal power to determine immigration policy is well settled." Arizona, 132 S. Ct. at 2498.

The United States Department of Justice argues that federal statutes prohibit this Court from issuing a law license to an unlawfully present alien, citing 8 U.S.C. § 1621 (2012). The Department of Justice also cites the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. Pub. L. No. 104-193, 110 Stat. 2105 (Aug. 22, 1996). This federal law prohibits specified categories of aliens from obtaining certain state public benefits. The statute first states that aliens are not "eligible for any State . . . public benefit" unless they are "qualified alien[s]" (defined in 8 U.S.C. § 1641 (2012)), nonimmigrant aliens (defined in 8 U.S.C. § 1101(a)(15) (2012)), or aliens who are "paroled" into the United States for less than one year. See 8 U.S.C. § 1621(a) (2012). Thus, pursuant to the statute, aliens who lack lawful immigration status are ineligible for certain public benefits (unless

a state takes specific action as set forth in 8 U.S.C. § 1621(d) (2012), discussed below).

Next, the statute defines the state public benefits for which these aliens are ineligible. The benefits include "any . . . professional license, or commercial license" that is provided "by appropriated funds of a State." See 8 U.S.C § 1621(c) (2012). A State license to practice law is a professional license. As this Court is funded through appropriations, the issuance of a license to practice law therefore falls within the prohibition set out in the federal statute. Simply stated, current federal law prohibits this Court from issuing a license to practice law to an unlawful or unauthorized immigrant.

Counsel for Applicant notes that 8 U.S.C. § 1621(d) (2012) allows a state to take specific action to "override the federal barrier" and provide a state public benefit to unauthorized immigrants. Under subdivision (d), a "State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under [8 U.S.C. § 1621(a) (2012)]." However, the state may only do so "through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d) (2012) (emphasis added). The plain language of the statute and case law indicate that the phrase "enactment of a State law" requires a state legislature to address this appropriations-related issue and

pass legislation, which the governor must either approve or permit to become the law of the State.[5]  See generally Martinez v. Regents of the Univ. of Ca., 241 P.3d 855, 859 (Cal. 2010) (examining whether a statute passed by the California Legislature met the requirements of 8 U.S.C. § 1621(d), which permits a state to make unlawful aliens eligible for public benefits otherwise prohibited by 8 U.S.C. § 1621); Day v. Sebelius, 376 F. Supp. 2d 1022 (D. Kan. 2005) (plaintiffs challenging a Kansas statute that made certain state university tuition benefits available to illegal aliens, and arguing that it did not meet the federal requirements set forth in 8 U.S.C. § 1621(d), were found to lack standing); League of United Latin American Citizens v. Wilson, 997 F. Supp. 1244, 1253 (C.D. Cal. 1997) (stating that 8 U.S.C. § 1621(d) provides "a description of state legislative options in the area of immigrant eligibility for state or local benefits").  In contrast to the clear language of the federal statute and case law, the amici and counsel for Applicant claim that non-legislative forms of "State law" could meet the requirements set forth in 8 U.S.C. § 1621(d) (2012).  However, they have failed to present any existing State of Florida law that governs the instant situation and complies with section 1621(d).  Cf. Martinez, 241 P.3d at 867-8 (stating that for

---

5.  A conference committee report on the bill that enacted section 1621 states that "the affirmative enactment of a law by a State legislature and signed by the Governor after the date of enactment of this Act" is required.  (H.R. Rep. No. 104–725, 2d Sess., p. 383 (1996)).

the California statute to comply with federal requirements, "the state statute must expressly state that it applies to undocumented aliens, rather than conferring a benefit generally without specifying that its beneficiaries may include undocumented aliens," with the court ultimately holding that the California statute did not violate 8 U.S.C. § 1621 because it expressly refers to "a person without lawful immigration status" and "undocumented immigrant[s]")[6]; see also Kaider v. Hamos, 975 N.E.2d 667, 674-5 (Ill. App. 1 Dist. 2012) (stating that a statute that confers "a benefit generally, without any indication that the [State] legislature intends to opt out of section 1621," would not satisfy the federal statute because section 1621(d) requires a state law to convey "a positive expression of legislative intent to opt out of section 1621(a) by extending state or local benefits to unlawful aliens"). Thus, there is no current State law that meets the requirements of section 1621(d) and permits this Court to issue a law license to an unauthorized immigrant.

Next, several amici and counsel for Applicant assert that unauthorized immigrants should be admitted to Florida Bar membership based on policies

---

6. On January 2, 2014, the California Supreme Court issued In re: Garcia, 315 P.3d 117, which admitted an unauthorized immigrant, Mr. Garcia, to the California State Bar. The California Supreme Court relied in large part on a state law that became effective on January 1, 2014, which explicitly authorizes applicants for the California State Bar who are not lawfully present in the United States to obtain a law license. The court held that the California statute satisfied the requirements of 8 U.S.C. § 1621(d) and removed any obstacles to Mr. Garcia's admission to the California Bar that may have been presented by other provisions of that federal statute.

announced by the executive branch of the federal government. They refer to a memorandum from Mr. John Morton, Director of United States Immigration and Customs Enforcement, which lists "individuals present in the U.S. since childhood" among the types of individuals who should not be considered priorities when deciding whom to prosecute for being illegally present in the United States. More significantly, they rely upon a new type of temporary permission to stay in the United States called "Deferred Action for Childhood Arrivals" (DACA), which was announced by the President of the United States on June 15, 2012, as a "policy directive." Amici and counsel for Applicant argue that an individual who has been given DACA status is lawfully present in the United States. However, a grant of DACA status is temporary and does not provide a path to lawful permanent resident status or United States citizenship. In fact, the Department of Homeland Security's website clearly states, with respect to "Consideration of Deferred Action for Childhood Arrivals Process," that:

> On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of two years, subject to renewal, and would then be eligible for work authorization. Deferred action is a discretionary determination to defer removal action of an individual as <u>an act of prosecutorial discretion. Deferred action does not provide an individual with lawful status.</u>

<u>See</u> U.S. Citizenship & Immigration Servs., "Consideration of Deferred Action for Childhood Arrivals Process," http://www.uscis.gov/humanitarian/consideration-

deferred-action-childhood-arrivals-process (updated January 18, 2013) (emphasis added); see also Saldana v. Lahm, 2013 WL 5658233, *1 (D. Neb. 2013) (United States District Court for Nebraska stating that DACA is a form of prosecutorial discretion, through which immigration authorities make a discretionary determination not to remove an individual from the United States during a specified period). The policy provides that people who are granted DACA status will not be a priority for the executive branch in enforcing deportation laws; the policy explicitly states that it does not provide an unauthorized immigrant with lawful status. The DACA program was recently considered by a United States District Court in Arizona Dream Act Coalition v. Brewer, 945 F. Supp. 2d 1049 (D. Ariz. 2013). The court stated:

> On June 15, 2012, Secretary Napolitano issued a memorandum announcing that certain young persons not lawfully present in the United States will be eligible to obtain deferred action if they meet specified criteria under the newly instituted DACA program. . . . The Napolitano memorandum makes clear that it "confers no substantive right, immigration status or pathway to citizenship[,]" and that "[o]nly the Congress, acting through its legislative authority, can confer these rights."

Id. at 1054. The federal district court held that:

> [t]he memorandum does not have the force of law. Although the Supreme Court has recognized that federal agency regulations "with the force of law" can preempt conflicting state requirements, Wyeth [v. Levine, 555 U.S. 555, 576 (2009)], federal regulations have the force of law only when they prescribe substantive rules and are promulgated through congressionally-mandated procedures such as notice-and-comment rulemaking. See River Runners for Wilderness

- 9 -

v. Martin, 593 F.3d 1064, 1071 (9th Cir. 2010) (citing United States v. Fifty-Three (53) Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir. 1982)). Secretary Napolitano's memorandum does not purport to establish substantive rules (in fact, it says that it does not create substantive rights) and it was not promulgated through any formal procedure.

. . . .

And to the extent Plaintiffs rely on the purposes of the DACA program, they are looking to a nonbinding policy of a federal agency, not the intent of Congress . . . . What is more, the Court certainly cannot impute the intentions of the DACA program to Congress when Congress itself has declined repeatedly to enact legislation that would accomplish the goals of the DACA program. See, e.g., DREAM Act of 2011, S. 952, H.R. 1842, 112th Cong. (2011).[7]

Arizona Dream Act Coalition, 945 F. Supp. 2d at 1060. DACA status does not have the force and effect of law. Therefore, it does not make substantive changes to federal immigration law.

In light of Arizona Dream Act Coalition and official statements by the Department of Homeland Security regarding the DACA program, the reliance by the amici and counsel for Applicant on these executive branch policies is misguided. Both the Morton memorandum and DACA status are executive branch policies addressing deportation and the exercise of prosecutorial discretion. They are not laws passed by Congress. These policies do not provide this Court with

7. See also DREAM Act of 2010, H.R. 6497, S. 3962, S. 3963, 111th Cong. (2010); DREAM Act of 2007, S. 774, 110th Cong. (2007).

- 10 -

legal authority to disregard the laws currently enacted by Congress and admit

unauthorized immigrants into Florida Bar membership.[8]

Accordingly, we answer the Florida Board of Bar Examiners' question by

holding that unauthorized immigrants are ineligible for admission to The Florida

Bar. Applicants are required to demonstrate that they are legally present in the

United States.

It is so ordered.

POLSTON, C.J., and QUINCE, CANADY, and PERRY, JJ., concur.
LEWIS, J. concurs in result.
LABARGA, J., concurs with an opinion, in which PARIENTE, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND,
IF FILED, DETERMINED.


LABARGA, J., concurring.

I reluctantly concur with the majority decision rendering an otherwise

qualified class of applicants ineligible to practice law in Florida simply on the basis

of their immigration status, but I do so only because the present state of federal and

Florida law compels me to reach such an inequitable conclusion. Specifically, the

Florida Legislature has failed to enact any law providing that unauthorized

---

8. During the Court's consideration of this matter, numerous public policy arguments were offered in favor of extending state public benefits to unlawful or unauthorized aliens. Arguments of this nature are properly presented to the Florida Legislature and the United States Congress. See generally Equal Access Educ. v. Merten, 305 F. Supp. 2d 585, n.32 (E.D. Va. 2004).

immigrants are eligible for certain public benefits, in this case a license to practice law, as authorized by 8 U.S.C. § 1621(d), and as the California Legislature recently did to clear the only impediment to Sergio Garcia's admission to the State Bar of California. See In re Garcia, 315 P.3d 117, 127 (Ca. 2014) (citing Cal. Bus. & Prof. Code § 6064 (West 2014)). Given this authority to determine the eligibility of a class of applicants to The Florida Bar, the Florida Legislature is in the unique position to act on this integral policy question and remedy the inequities that the unfortunate decision of this Court will bring to bear.[9]

The injustice of this decision is more apparent when applied to Applicant, who was the impetus for the Board's petition for an advisory opinion only after the Board adopted a policy in January 2008 requiring applicants to provide immigration documents. As a nine-year-old child, Applicant legally entered the United States from Mexico with his family, who had passports and valid tourist visas. Through no fault of his own, however, his family overstayed their visas and opted not to return to Mexico. Although Applicant initially only spoke Spanish, he successfully integrated into American society by learning English, becoming an

---

9. Typically, this authority is reserved exclusively for this Court pursuant to the provisions of the Florida Constitution, subordinate in this instance to the supreme law of the land. See art. V, § 15, Fla. Const. (providing that this Court is vested with "exclusive jurisdiction to regulate the admission of persons to the practice of law. . . .").

- 12 -

Eagle Scout, graduating from a Tampa high school as valedictorian,[10] graduating from New College of Florida,[11] and graduating from The Florida State University College of Law with several book awards.[12] Throughout the Bar admissions process, Applicant disclosed his immigration status, and the Board indicated in a notice of supplemental authority dated March 15, 2013, that "nothing presently contained in [Applicant's] investigative file will, in and of itself, be considered disqualifying." Further, Applicant passed The Florida Bar Examination. Moreover, numerous law professors, the general counsel of his undergraduate institution, an attorney from Gulfcoast Legal Services, and past presidents of the American Bar Association strenuously supported Applicant's eligibility for admission to The Florida Bar. Thus, it has become increasingly apparent throughout these proceedings that Applicant is an otherwise legally qualified applicant for admission to The Florida Bar and that he is the type of exemplary

10. While in high school, he received: (1) an AP Scholar with Distinction Award; (2) the President's Education Award for Outstanding Academic Excellence; (3) an award for Achievement in Academics; (4) a Magna Cum Laude Award in the National Latin Examination; and (5) the 2002 HACER Scholarship. He was also a member of the National Honor Society.

11. New College of Florida is considered the public "honors college" of Florida.

12. He was able to attend law school on privately funded scholarships. Further, he received book awards, which are awards given to recognize outstanding academic achievement, in Immigration Law, Contracts II, and Comparative Constitutional Law.

individual The Florida Bar should strive to add to its membership. However, as discussed below, Applicant is an unauthorized immigrant ineligible to receive public benefits under federal law because, as he explained in his law school application essay, he did not resist his parents when they chose to escape their impoverished conditions in Mexico.

Although Florida law ordinarily governs Bar admissions, under the supremacy clause of the United States Constitution, our state laws are subordinate to federal statutes adopted pursuant to Congress's authority under the United States Constitution. The federal statute at issue here, 8 U.S.C. § 1621, was adopted pursuant to Congress's "constitutional power to 'establish an [sic] uniform Rule of Naturalization' " due, in part, to "its inherent power as sovereign to control and conduct relations with foreign nations." See Arizona v. U.S., 132 S. Ct. 2492, 2498 (2012). Further, "past decisions of the United States Supreme Court clearly establish that the federal government generally has 'plenary authority' over matters relating to immigration . . . and that provisions of federal law relating to immigration prevail over any conflicting state law." In re Garcia, 315 P.3d at 125 (citing Arizona, 132 S. Ct. [at 2498-2502]; Takahashi v. Fish Comm'n, 334 U.S. 410, 419 (1948); Hines v. Davidowitz, 312 U.S. 52, 62-74 (1941)). "Accordingly, even with respect to matters that ordinarily and historically are an appropriate subject of state regulation—such as a state's granting or denial of a license to

practice law in the state—when the federal government has enacted a law restricting the right of a non-United States citizen to obtain such a professional license, under the supremacy clause the applicable federal statute will necessarily take precedence and prevail over any conflicting state law." Id. at 125.

The plain language of 8 U.S.C. § 1621 indicates Congress's intent to preclude unauthorized immigrants from receiving professional licenses provided by appropriated governmental funds. The issuance of a license to practice law to an unlawfully present alien would require an order of this Court. See Fla. Bar Admiss. R. 5-11. This Court is funded through appropriations. See art. V, § 14(a), Fla. Const. ("Funding for the state courts system . . . shall be provided from state revenues appropriated by general law."). Thus, a license to practice law in Florida is issued by appropriated funds and subject to the provisions of 8 U.S.C. § 1621. As noted in the majority, 8 U.S.C. § 1621(d) provides that the Florida Legislature may stipulate that an unauthorized immigrant is eligible for any public benefit "through the enactment of a State law . . . which affirmatively provides for such eligibility." Despite this grant of uncharacteristic authority, the Florida Legislature has chosen not to act on this vital policy question.

When the Supreme Court of California was presented with a similar set of circumstances, the California Legislature enacted a state law affirmatively providing for such eligibility. Rather than allowing Sergio Garcia and other

similarly situated applicants to be denied admission to the California State Bar solely on account of their immigration status, the California Legislature enacted, and the Governor of California signed, section 6064(b) of the California Business and Professional Code into law.  See In re Garcia, 315 P.3d at 125.  Section 6064(b) of the Code provides that an unauthorized immigrant who has fulfilled all the requirements for admission to practice law may be admitted as an attorney at law in all the courts of California.[13]  However, after concluding that California's conflicting state law was subordinate to 8 U.S.C. § 1621, the Supreme Court of California considered whether the "recent legislation passed by the California Legislature and signed by the Governor enacting section 6064(b) satisfies the federal requirements set forth in section 1621(d) and thus removes any obstacle this federal statute would otherwise pose to [the Supreme Court of California's] admission of Garcia to the State Bar."  Id. at 127.  The Supreme Court of California held that it did, reasoning that the legislative enactment satisfied the requirements of 8 U.S.C. § 1621 because it was enacted after August 22, 1996, and the statute expressly applies to unauthorized immigrants.  Id. at 129.

---

13.  The full text of section 6064(b) provides: "Upon certification by the examining committee that an applicant who is not lawfully present in the United States has fulfilled the requirements for admission to practice law, the Supreme Court may admit that applicant as an attorney at law in all the courts of this state and may direct an order to be entered upon its records to that effect.  A certificate of admission thereupon shall be given to the applicant by the clerk of the court." Cal. Bus. & Prof. Code § 6064 (West 2014).

If the Florida Legislature were to take steps similar to those taken in California, and affirmatively provide that such unauthorized immigrants are eligible for professional licenses, or, more narrowly, a license to practice law, Applicant and other similarly situated qualified individuals would be eligible for admission to The Florida Bar pursuant to our current rules. As currently stated in the Florida Bar Admission Rules, the rules governing admission are reviewed, approved, and promulgated by this Court, and the admission of attorneys to the practice of the profession of law is a judicial function. See Fla. Bar Admiss. R. 1-11, 1-12. To be recommended for admission to The Florida Bar by the Florida Board of Bar Examiners, applicants must meet the requirements of all the applicable rules with regard to character and fitness, education, and technical competence. See Fla. Bar Admiss. R. 1-16. Notably, our rules do not require the attainment of a certain level of immigration status in this country or that the applicant be authorized to work for compensation to be recommended for admission to The Florida Bar. Throughout these proceedings, however, it has been suggested that unauthorized immigrants are ineligible to be admitted to The Florida Bar because this class of applicants is unlawfully present or potentially subject to federal employment restrictions.

Regarding unlawful presence, it has been argued that Florida Bar Admission Rule 3-10.1(c)(4) requires applicants to demonstrate that they will "avoid acts that

- 17 -

are illegal, dishonest, fraudulent, or deceitful," and that Applicant and other future similarly situated applicants have been unlawfully present in the United States for a period of time and will continue this unlawful presence. Further, Florida Bar Admission Rule 3-10.1(c)(5) requires applicants to demonstrate that they will "comply with the requirements of applicable state, local, and federal laws, rules, and regulations; any applicable order of a court or tribunal; and the Rules of Professional Conduct," and Florida Bar Admission Rule 3-11(a) provides that conduct disqualifying an applicant from admission includes "unlawful conduct." Thus, it has been argued, Applicant and others similarly situated cannot be eligible for admission to The Florida Bar because they cannot comply with immigration laws. Cf. Godoy v. The Office of Bar Admissions, No. 1:05-CV-0675-RWS, 2006 WL 2085318, *5 (N.D. Ga. July 25, 2006) ("An applicant's willingness to maintain an unlawful residence in the United States, like his ongoing participation in other illegal activities, has an undeniable bearing on that applicant's character and fitness to practice law."). However, our rules and case law do not support this myopic viewpoint, and application of our rules to Applicant demonstrates as much.

Florida Bar Admission Rule 2-12 provides that "[a]ll applicants seeking admission to The Florida Bar must produce satisfactory evidence of good moral character, an adequate knowledge of the standards and ideals of the profession, and

proof that the applicant is otherwise fit to take the oath and to perform the obligations and responsibilities of an attorney. . . ." "The sole purpose of [requiring proficiency in the law and good moral character] is to protect the public." Fla. Bd. of Bar Exam'rs re G.W.L., 364 So. 2d 454, 458 (Fla. 1978). "Finding a lack of good moral character is not restricted to acts reflecting moral turpitude, but, rather, includes 'acts and conduct which would cause a reasonable man to have substantial doubts about an individual's honesty, fairness and respect for the rights of others and for the laws of the state and nation.' " Fla. Bar re Jahn, 559 So. 2d 1089, 1090 (Fla. 1990) (quoting G.W.L., 364 So. 2d at 458 (emphasis added)). Thus, the effect an applicant's unlawful presence has on the applicant's record of moral character should be evaluated with two questions in mind: does the public need to be protected from the conduct at issue and does the applicant's unlawful presence reflect moral turpitude or cause a reasonable person to have substantial doubts about the applicant's honesty, fairness, and respect for the rights of others and the law.

Indeed, the language of the rules suggests that this is the ultimate purpose of a background investigation. For instance, Florida Bar Admission Rule 3-10, which is followed by Florida Bar Admission Rule 3-10.1 discussed above, provides that applicants must have a record of conduct that "justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to him

or her." (Emphasis added). Florida Bar Admission Rule 3-10.1 also refers to the following essential attributes of an attorney: (1) knowledge of the principles of law; (2) ability to reason logically; (3) ability to comply with deadlines; (4) ability to communicate candidly and civilly with clients, attorneys, courts, and others; and (5) ability to conduct financial dealings in an honest manner. Finally, Florida Bar Admission Rule 3-11, titled "Disqualifying Conduct," refers to "lack of honesty, trustworthiness, diligence, or reliability. . ." and "academic misconduct," fraud, deceit, misrepresentation, irresponsibility, neglect of professional obligations, mental or emotional instability, and evidence of drug or alcohol dependency, among multiple examples of disqualifying conduct. Accordingly, it is apparent that our rules are concerned with an applicant's record of moral behavior, trustworthiness, reliability, and mental health when evaluating whether an applicant has produced satisfactory evidence of good moral character. See Fla. Bd. of Bar Exam'rs re M.R.I., 623 So. 2d 1178, 1180 (Fla. 1993) (quoting Fla. Bd. of Bar Exam'rs re J.H.K., 581 So. 2d 37, 39 (Fla. 1991) ("While there is no litmus test by which to determine whether an applicant for admission to the Bar possesses good moral character, we have said that no moral character qualification for Bar membership is more important than truthfulness and candor.")).

A fair reading of these rules in this context does not lead to the conclusion that unauthorized immigrants as a class are invariably ineligible for admission to

The Florida Bar or to take the required oath of office based solely on their unlawful presence in this country.[14] First, unlawful presence is not a criminal offense and does not involve moral turpitude. The Supreme Court of California, in considering this identical concern, observed the following:

> Although an undocumented immigrant's presence in this country is unlawful and can result in a variety of <u>civil sanctions</u> under federal immigration law (such as removal from the country or denial of a desired adjustment in immigration status) (8 U.S.C. §§ 1227(a)(1)(B), 1255(i)), an undocumented immigrant's unauthorized presence does <u>not</u> constitute a <u>criminal offense</u> under federal law and thus is not subject to criminal sanctions. Moreover, federal law grants federal immigration officials broad discretion in determining under what circumstances to seek to impose civil sanctions upon an undocumented immigrant and in determining what sanctions to pursue. (<u>See, e.g.</u>, <u>Arizona v. United States</u>, [132 S. Ct. at 2498-99].) Under current federal immigration policy it is extremely unlikely that immigration officials would pursue sanctions against an undocumented immigrant who has been living in this country for a substantial period of time, who has been educated here, and whose only unlawful conduct is unlawful presence in this country.

<u>In re Garcia</u>, 315 P.3d at 130 (emphasis in original). Moreover, unlawful presence does not prevent an individual from performing the obligations and responsibilities

---

14. Currently our rules prohibit the following classes of individuals from applying for admission: (1) individuals who have been disbarred or have resigned pending disciplinary proceedings; (2) individuals who have been suspended for disciplinary reasons in a foreign jurisdiction and the period of suspension has not expired; (3) individuals who have been convicted of a felony and have not had their civil rights restored; (4) individuals who are serving felony probation; and (5) individuals who were previously denied admission by a negotiated consent judgment. <u>See</u> Fla. Bar Admiss. R. 2-13.1, 2-13.2, 2-13.3, 2-13.4, and 2-13.5. This exhaustive list does not include individuals who are unlawfully present in this country.

of an attorney; does not in and of itself cause a reasonable person to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws; does not affect an individual's trustworthiness; and does not affect an individual's reliability. Thus, unlawful presence in this country is not in and of itself a disqualifying factor for admission to The Florida Bar. Accord In re Garcia, 315 P.3d at 130-31 ("We conclude the fact that an undocumented immigrant is present in the United States without lawful authorization does not itself involve moral turpitude or demonstrate moral unfitness so as to justify exclusion from the State Bar, or prevent the individual from taking an oath promising faithfully to discharge the duty to support the Constitution and laws of the United States and California.").

Indeed, a contrary result would prove unjust as applied to Applicant. For instance, as noted earlier, Applicant's application revealed that, though unlawfully present, he arrived in this country at the age of nine, assimilated to this country's culture, and excelled in academics and in community endeavors. Further, many individuals who have come to meet Applicant and know of his unlawful status have provided glowing recommendations as to his character and fitness to practice law in Florida. What is more, the Florida Board of Bar Examiners itself has reached the conclusion that he is otherwise fit to practice law. Accordingly, a determination that Applicant is not of good moral character to join this

profession—despite overwhelming proof of his impeccable character, knowledge of the law, and ability to reason logically—because his family chose to overstay their visas and he chose to remain with his family as an adult after he assimilated to this country's culture, would be an absurd result.

It has also been suggested that unauthorized immigrants who are restricted from working for compensation under federal law are ineligible for admission to The Florida Bar.[15] This argument is equally unpersuasive. Congress has enacted laws that set the terms of employment for aliens and impose civil and criminal penalties on employers who attempt to recruit or hire an unauthorized alien. See 8 U.S.C. §§ 1324-1324a (2012). Thus, unauthorized immigrants who have not received authorization to work cannot work in the United States for compensation. As noted by the Supreme Court of California, however, an unauthorized immigrant's inability to represent clients in some matters or for compensation "does not necessarily preclude all possible uses of a law license." In re Garcia, 315 P.3d at 132.[16] Further, an unlawfully present attorney would still have to abide by the Rules of Professional Conduct, and there is no reason to speculate that an otherwise qualified applicant (someone who has provided satisfactory evidence of

---

15. Applicant has received some form of work authorization. Thus, this portion of the discussion is not applicable to his circumstances at the present time.

16. For instance, pro bono services could be rendered.

good moral character) would violate federal laws pertaining to employment authorization for unauthorized immigrants.  See, e.g., In the Matter of Ravindra Singh Kanwal, D2009-053 (OCIJ July 8, 2009) (disciplinary action against licensed attorney who filed petitions for immigration benefits, and appeared in immigration courts on behalf of clients, even though he lacked authorization to work in the United States); People v. Kanwal, No. 09PDJ071, 2009 WL 2579847 (Colo. O.P.D.J. July 21, 2009) (suspending same attorney in Colorado); In the Matter of Noel Peter Mpaka Canute, D2010-124 (OCIJ March 16, 2011) (disciplining licensed attorney for filing petitions for immigration benefits on behalf of clients in violation of federal law); In re Mpaka, 939 N.Y.S.2d 157 (N.Y. App. Div. 2012).  To the contrary, as the Supreme Court of California concluded, it should be assumed "that a licensed undocumented immigrant will make all necessary inquiries and take appropriate steps to comply with applicable legal restrictions and will advise potential clients of any possible adverse or limiting effect the attorney's immigration status may pose."  In re Garcia, 315 P.3d at 133.

In addition, as argued by the Department of Justice in its amicus brief, whether a license to practice law may be issued is not dependent on whether the applicant may be legally employed.[17]  Notably, 8 U.S.C. § 1621(d) confers upon

---

17.  As noted in the majority op. at 4 n.3, this Court issued an order requesting that the Department of Justice file an amicus brief addressing several issues, including many related to an unauthorized immigrant's authorization to

state legislatures the authority to provide that unauthorized immigrants are eligible to receive a license to practice law, but the statute does not condition the grant of such licenses on proof of work authorization. Perhaps this is so because federal law restrictions on employment change periodically, and many undocumented immigrants are now eligible to obtain work authorization. See In re Garcia, 315 P.3d at 132. Moreover, enforcement of the federal provisions governing employment of unauthorized immigrants is the responsibility of the federal government, not state government. Accordingly, an unauthorized immigrant's potential inability to obtain work authorization under federal law is not an obstacle to admission to The Florida Bar pursuant to our rules.

Based on the foregoing, it is evident that the only barrier to admission to The Florida Bar for Applicant and others similarly situated is 8 U.S.C. §§ 1621(a) and (c). Indeed, in many respects, Applicant's life in the United States parallels my own. He and I were brought to this great nation as young children by our hardworking immigrant parents. We both learned to read, write, and speak the English language within a short period of time. We excelled scholastically and graduated from college and law school—Applicant from Florida State University

---

work and the effect the authorization to work or lack thereof has on an applicant's eligibility for admission to The Florida Bar. The Department of Justice urged this Court not to base its decision on an unauthorized immigrant's ability to work for compensation under federal law.

and I from the University of Florida. Both of us were driven by the opportunities this great nation offered to realize the American dream. Sadly, however, here the similarities end and the perceptions of our accomplishments begin. When I arrived in the United States from Cuba in 1963, soon after the Cuban Missile Crisis—the height of the Cold War—my parents and I were perceived as defectors from a tyrannical communist regime. Thus, we were received with open arms, our arrival celebrated, and my path to citizenship and the legal profession unimpeded by public policy decisions. Applicant, however, who is perceived to be a defector from poverty, is viewed negatively because his family sought an opportunity for economic prosperity. It is this distinction of perception, a distinction that I cannot justify regarding admission to The Florida Bar, that is at the root of Applicant's situation. Applicant is so near to realizing his goals yet so agonizingly far because, regrettably, unlike the California Legislature, the Florida Legislature has not exercised its considerable authority on this important question. Thus, only reluctantly do I concur with the majority decision.

PARIENTE, J., concurs.

Original Proceeding - Florida Board of Bar Examiners

Alan H. Aronson, Chair, Michele A. Gavagni, Executive Director, and Robert G. Blythe, General Counsel, Florida Board of Bar Examiners, Tallahassee, Florida; James J. Dean and Robert J. Telfer III of Messer Caparello, P.A., Tallahassee, Florida,

      for Petitioner

Talbot D'Alemberte and Patsy Palmer of D'Alemberte & Palmer, PLLC, Tallahassee, Florida,

    for Respondent

Terence S. Coonan, Executive Director, and Wendi Adelson, Counsel, Tallahassee, Florida,

    for Amicus Curiae Florida State University Center for Advancement of Human Rights

Cheryl Little and Lana Chiariello, Miami, Florida

    for Amicus Curiae Americans for Immigrant Justice

Martha W. Barnett, Tallahassee, Florida; William Reece Smith, Jr. of Carlton Fields, Tampa, Florida; and Stephen N. Zack of Boies Schiller & Flexner, Miami, Florida,

    for Amici Curiae Past Presidents of the American Bar Association

Amy R. Pedersen of the Mexican American Legal Defense and Educational Fund, Washington, DC; and Cecilia M. Olavarria of the Law Offices of Cecilia M. Olavarria, PA, Miami, Florida,

    for Amicus Curiae Dream Bar Association

Stuart F. Delery, Acting Assistant Attorney General, and Mark B. Stern and Daniel Tenny, Attorneys, United States Department of Justice, Washington, D.C.,

    for Amicus Curiae The United States of America